IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| JON B. TIGGES )<br>16652 Mandileigh Lane )<br>Hamilton, Virginia 20158 )<br> )<br>        Plaintiff, )<br> )<br>    v. )<br> )<br>RALPH S. NORTHAM )<br>Governor, Commonwealth of Virginia )<br>SERVE: )<br>    Mark R. Herring )<br>    Attorney General )<br>    service@oag.state.va.us )<br> )<br>    and )<br> )<br>M. NORMAN OLIVER )<br>State Health Commissioner )<br>SERVE: )<br>    Mark R. Herring )<br>    Attorney General )<br>    service@oag.state.va.us )<br> )<br>        Defendants. )<br> | Case No. 3:20-cv-00410-JAG |

## **COMPLAINT**

The plaintiff, Jon Tigges("Tigges" or "Plaintiff"), moves the Court for entry of judgment against the Defendant the Honorable Governor Dr. Ralph S. Northam ("Governor") and the Honorable Commissioner Dr. M. Norman Oliver ("Commissioner") (collectively, "Defendants") and in support of such Complaint states as follows:

## NATURE OF ACTION AND JURISDICTION

1.      This case arises from a decision by Dr. Northam, the Governor of Virginia beginning on March 12, 2020, to govern the Commonwealth by Executive Order, thereby (i) suspending civil rights in Virginia, including the right to peaceably assemble and attend religious services, and (ii) depriving certain persons of the right under Article I, Section 11 of the Virginia Constitution *inter alia* to own and utilize their private property.  These Executive Orders were taken under color of a "public emergency" and bear no legislature imprimatur.  Nor have they been reviewed on the merits by a court of competent jurisdiction.  In fact, the state legislature has not been called into session since March 12, 2020, when it adjourned *sine die* for the year, except for a one-day "veto session" on April 22, 2020, which solely addressed the Governor's actions on bills previously passed.  As of the date of this filing, the "Government by Executive Order" has been in effect for eighty-eight (88) days and counting.  It is on its face a continuing violation of the United States and Virginia Constitutions.

2.      This claim is a civil action under 42 U.S.C § 1983 and Article 8, Section I of the Virginia Constitution seeking damages and injunctive relief against Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Mr. Tiggesof rights secured under the Constitution and laws of the United States and the Commonwealth of Virginia.

3.      This case arises under the United States Constitution, specifically Amendments 5 and 14, and 42 U.S.C. §§1983 and 1988, as amended.  This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343. The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§2201 and 2202, 42 U.S.C. §1983 and Rule 57 of the Federal Rules of Civil Procedure.

4.      This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2). The actions complained of took place in this judicial district; evidence and

2

records relevant to the allegations are maintained in this judicial district; and Tigges, the Governor, and the Commissioner all reside in the Commonwealth of Virginia.

## PARTIES

5.     Plaintiffs reside in Loudoun County, Virginia, where they own three (3) contiguous lots totaling twenty-four (24) acres ("the Property").  The Property is zoned Agricultural Rural 1 ("AR 1") and is located in a rural setting with surrounding orchards, gardens, nurseries, chickens, beehives, vineyards, and woods.

6.     The Governor is the Chief Executive Officer of the Commonwealth of Virginia. As such, he has executive authority to issue certain proclamations, including declarations of public emergency pursuant to state law. The Governor has been delegated certain authorities from the Virginia General Assembly as Director of Emergency Management.

7.     The Commissioner is the Commissioner of the Virginia Department of Health and has signed orders at issue in the instant case, purportedly pursuant to authority of Virginia laws.

8.     At all relevant times, the Governor and the Commissioner acted under color of state law, i.e. by issuing orders which create new mandates that are purportedly pursuant to provisions of Virginia law and subject citizens and businesses to criminal penalties of up to 1 year in jail and up to $25,000 for each violation under authority of state law.

## FACTS

9.     Tigges is the owner of Zion Springs, LLC ("Zion Springs") which is a licensed farm winery in Loudoun County, having received its designation from the Alcohol Beverage and Control Board in September of 2018.  Previous to that, Zion Springs was a licensed bed and breakfast.  As a farm winery, Mr. Tigges grows his own grapes and produces his own wines.  Per Virginia law, he is also allowed to host social gatherings, which include weddings and other private

3

events for over fifty (50) people.  These events are, by definition, private only, and his business is not otherwise open to the public.

10.     At Zion Springs, Tiggesoperates a business that specializes in hosting weddings and other private receptions.  For a fixed price, a person can buy a wedding package at Zion Springs which includes meals and beverages, photography, event planning, design, entertainment, on-site lodging for the wedding party, and an outdoor area (and indoor barn) for music and dancing. Tigges and his wife have been hosting weddings since 2010, when he first received his bed and breakfast designation.  In August 2018, he received his farm winery designation, which allowed him to bottle and sell his own wines as part of the package.  In 2019, the first full year with the designation, he grossed $1,324,534 in revenue from hosting weddings and similar events.  This revenue is utilized to cover all costs relating to the Property as well as the business.

11.     All such events are private and invite-only.  Most weddings also involve a religious service that occurs on-site.  Plaintiff also provides for corporate events and fundraisers.  The corporate events and fundraisers can involve discussions of policy and politics as direct parts of the agenda or generally involve political fundraising.

<u>Virginia Law Regarding Civil Rights</u>

12.     The Virginia Constitution predates the United States Constitution and, indeed, served as a precursor for it. It delineates certain individual rights that cannot be abrogated by executive action.

13.     Art. I, Section I of the Virginia Constitution states:

> That all man are by nature equally free and independent and have certain inherent rights, of which, when they enter a state of society, they cannot, by any compact, deprive or divert their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety.

4

14.     Art. I, Section 6 of the Virginia Constitution states:

That all men …have the right of suffrage and cannot be taxed, or deprived of, or damaged in, their property for public uses, without their consent, or that of their representatives duly elected or bound by any law which they have not, in like manner, assented for the public good.

15.     Art. I, Section 7 of the Virginia Constitution states:

That all power of suspending laws, or the execution of laws, by any authority, without consent of the representatives of the people is injurious to their rights and ought not to be exercised.

16.     Art. I, Section 11 of the Virginia Constitution states:

That no person shall be deprived of his life, liberty or property except by due process of law.

That the General Assembly shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use. No private property shall be damaged or taken for public use without just compensation to the owner thereof.   No more private property may be taken than necessary to achieve the stated public use.  Just compensation shall be no less than the value of the property taken, lost profits and lost access and damage to the residue caused by the taking.

17.     Art. I, Section 12 of the Virginia Constitution states:

That the General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people to peaceably to assemble, and to petition the government for the redress of grievances.

### **Federal Law Regarding Civil Rights**

18.     These constitutional rights enjoyed by Virginians are in addition to their

fundamental constitutional rights enjoyed as Americans, which includes the right to the free

exercise of religion, the right "peaceably to assemble," and the right to not be "deprived of life,

liberty or property, without due process of law."  U.S. Constitution, Amends. I, V and XIV ("No

state shall make or enforce any law which shall abridge the privileges and immunities of citizens

of the United States; **nor shall any State deprive any person of life, liberty or property, without**

**due process of law;** nor deny to any person within its jurisdiction the equal protection of the laws").

19.     It has been the practice of the Federal Courts for the last fifty years to rely upon the Federal Constitution and Section 1983 to enjoin unconstitutional behavior when state actors deprive constitutional rights under color of state authority.  This right is especially salient when there is no countervailing actor available under the state political system to defend these same rights.[1] *See Mitchum v. Foster*, 407 U.S. 225 (1972).

20.     The existence of these rights is of material value to Tiggesas a Virginia citizen, taxpayer, and business owner.

<u>Governor Closes Economy Due to COVID-19</u>

21.     In late February of 2020, public officials in Virginia became increasingly aware of the presence of COVID-19, which was a pandemic that had originated in the Wuhan province of China and was spreading to other nations.  Pursuant to that awareness, an initial

22.     On **March 5, 2020**, near the end of the 2020 legislative session, officials of the Governor's Executive Branch, including Commissioner Oliver, held a briefing for members of the General Assembly regarding the issue of "coronavirus" (i.e. COVID-19) and the potential impact on Virginia.

23.     At that time, officials focused on practical health tips such as washing hands, covering the mouth for coughing, and avoiding crowds if you were sick.  No mention was made of closing schools or shutting down businesses.  As of that date, no reported cases had occurred in Virginia.

---

[1]     Virginia has a judicial branch authorized under Article VI of the Virginia Constitution in which judges are elected by the Virginia General Assembly and/or appointed by the Governor when the Assembly is out of session. At present, both branches of the General Assembly are controlled by the same political party as the Governor.  The Attorney General, authorized to enforce the Constitution, is also of the same party as the Governor.

24.     On Sunday, March 8, 2020, the first reported cases of COVID-19 were confirmed in Virginia.

25.     Shortly thereafter, reports of COVID-19 in Virginia spread quickly and the situation changed dramatically.

26.     As of June 5, 2020, the Virginia Department of Health has reported the following aggregated statistics:

      i.   48,532 positive tests for COVID-19;[2]

     ii.   5,008 hospitalized for COVID-19;[3]

    iii.   1,453 fatalities caused by COVID-19.[4]

27.     Even accounting for the inability to test every Virginian, it is apparent that over 99.9% of Virginians are not suffering from COVID-19.

28.     More pertinently, the VDH statistics show that those persons most susceptible to COVID-19, i.e. most likely to be infected and then perish, are primarily located in nursing homes and long-term care centers. Over half of all COVID-19 deaths in Virginia are from citizens that are older than 80 years of age. Three-quarters of all COVID-19 deaths in Virginia come from citizens that are 70+ years of age.

29.     This public health data was not known in March 2020, when the COVID-19 pandemic reached Virginia.

---

[2]     This includes positive tests dating back to March, meaning that the overwhelming majority of those persons tested positive have returned to daily living.  Notably, the testing in Virginia has been limited to those persons "showing symptoms" of COVID-19 rather than the public in general, flowing from the logical presumption that non-symptomatic persons are less likely to have COVID-19.

[3]     As with the "positive tests," this is an aggregated number, with the current hospitalization number being closer to 1,000 persons.   *See* https://www.vdh.virginia.gov/coronavirus/.

[4]     Using the baseline population of 8.6 million Virginians, the VDH data means that 0.002% has tested positive for COVID-19 and 0.0003% have been hospitalized.

30.     It is known now, and these figures are not disputed. [5] Indeed, these statistics originate from the very state agencies that are now attempting to justify a sustained closure of private businesses by non-democratic means.

The Governor Issues First Executive Order (EO 51)
Anticipating Coronavirus Spread

31.     When COVID-19 arrived in Virginia—with the first diagnosed case on March 8th— there was no immediate call to close the economy.  That changed swiftly.

32.     On March 12, the Governor issued Executive Order 51 ("EO 51"), which noted the outbreak of the COVID-19 virus, declared the anticipated effects a "disaster," and declared a "state of emergency exists" so that the Commonwealth could "continue to prepare and coordinate our response to the potential spread of COVID-19, a communicable disease of public health threat." A copy of the order is attached hereto and incorporated herein as Exhibit A.

33.     The Governor issued EO 51 under his authority as Governor and Director of Emergency Management under §§ 44-146.17 and 44-75.1 of the Virginia Code.  *See* Exh. A at 1.

34.     That order on its face was intended to expire on June 10, 2020.  In other words, the Governor predicted that the "emergency" would last exactly ninety (90) days. *Id*. at 2.

35.     Notably, no businesses or schools were closed under EO 51.  It instead authorized state agencies to respond to the pandemic and allocated $10.0 million in state funding for any emergency operations.

Governor Issues New Executive Orders (EO 52 and 53)
Closing Down Economy

36.     During the two weeks, the media attention on COVID-19 became all-consuming, as nearly all sectors of the U.S. economy shut down in the face of the oncoming pandemic.

---

[5]     The statistics from the Virginia Department of Health ("VDH") include both actual and "probable" cases for COVID-19 so as to avoid an under-count.

37.     At that time, public health officials, including the nation's infectious disease specialist, Anthony Fauci, M.D., were predicting that the United States would undergo a pandemic that spring that would lead a wholesale loss of life.

38.     In the face of these predictions, public pressure grew for more dramatic "public" actions to prevent the presumed carnage.

39.     On March 17, 2020, the Governor issued a new Executive Order ("EO 52"), which limited seating in restaurants, fitness centers, and theaters to no more than ten (10) per establishment.  As a result, EO 52 acted as a *de facto* "shut down" order for thousands of Virginia businesses, including the farm winery business of Tigges.

40.     On March 23, 2020, the Governor of Virginia issued Executive Order 53 ("EO 53") which in broad sweeping terms  (i) "shut down" thousands of private businesses, whether open to the general public or not, and (ii) announced that schools would be closed through the end of the school year.  A copy of EO 53 is attached hereto and incorporated herein as Exhibit B.

41.     Regarding the "shut-down" of private business, EO 53 specifically did the following:

   a.   Prohibited all in-person gatherings of ten or more people;

   b.   Closed all restaurants, food courts, breweries, distilleries, *wineries*, tasting rooms, and farmers' markets;

   c.   Closed all public access to recreational and entertainment businesses, including theaters, performing arts centers, concert venues, fitness centers, beauty salons, barbershops, bowling alleys, skate rinks, public and private social clubs and all other places of indoor public amusement;

42.     EO 53, which prescribed a Class 1 misdemeanor for any violations, specifically referenced the "expertise of public health officials and their models for continuing spread of COVID-19 throughout the Commonwealth and the nation."  None of those models were attached to or incorporated into the Order.  Nor has there been any effort made *ex post facto* to determine if the models were actually accurate.[6]

43.     At the time of its issuance, EO 53 did not contain the following:

  i.   Any actual statistics regarding COVID-19 in Virginia;

  ii.  Any accounting for regional or age-related variations regarding COVID-19 in Virginia;

  iii. Any standards or metrics for re-opening closed businesses;

  iv.  A termination date other than the Order "shall remain in full force and effect until amended or rescinded by future executive action."

44.     None of that data has since been added.

45.     The Executive Order on its face referenced Section 44.1-146.17 of the Code of Virginia, i.e. the ability of the Governor to declare a "public emergency." It made no reference to constitutional rights, including the rights of Virginians to possess and enjoy private property which could only be limited by the "consent or that of their duly elected representatives."  VA Const. Art. I, §6.

---

[6]     Now that the pandemic has lasted nearly three (3) months, it is easily possible to compare the epidemiological statistics between Virginia, which has instituted strict lockdown policies since March 23rd and other states with similar demographics (Georgia, Florida, Texas, Missouri) which instituted few, if any, restrictive measures.

46.     Indeed, Governor Northam and Commissioner Oliver over the last three months have preceded on the grounds that they need only vague references to executive constitutional power and statutes relating to public emergency to justify their sweeping and extended actions.

Governor Allows Partial Re-Opening of Virginia<br>
But Suspends Effect in Loudoun County

47.     On May 8, 2020, six weeks after the issuance of EO 53, the Governor issued Executive Order 61 ("EO 61") and Commissioner Oliver issued Order of Public Health Emergency Three, an 11-page set of orders which allowed for a "limited re-opening" of the Virginia economy, i.e. by entering "Phase One" of the reopening plan. *See* a copy of EO 61 and Order of Public Health Emergency ("OPHE") Three which is attached hereto and incorporated as Exhibit C.

48.     On its face, EO 61 and OPHE Three permitted the re-opening of restaurants, wineries *inter alia* for on-site dining on May 15, 2020, as long as it was limited to "outdoor dining and beverage service only."[7]  Besides the outdoors-only restriction, occupancy was limited to 50% of the lowest occupancy load per the certificate of occupancy.

49.     However, that order itself was tempered a few days later by a later amendment, Executive Order 62 ("EO 62") and OPHE Four, which kept northern Virginia in "Phase Zero," thus keeping it within the total shut-down contemplated by EO 53 and EO 55. *See* Exh. F.

50.     On its face, EO 62 and OPHE Four, by applying only to certain named jurisdictions, was (and is) "special legislation" which required concurrence from two-thirds of each body of the legislature.  Va. Const. Art. VII, § 1. No such concurrence was sought or given.

---

[7]     Since the initial issuance of EO 62, the "Phase One reopening," it has been amended three (3) times.  Those three amendments are attached hereto as Exhibits D, E and F.  The first two amendments deal with the opening of public beaches at Virginia Beach.  The third amendment, entered June 2nd, references the continued delay of Northern Virginia in "Phase One," even while the rest of the state was moving into "Phase Two.

51.     Not to mention the fact that, while the Governor has publicly indicated 'discretion' will be applied in enforcement, EO 62 and OPHE Four criminalize certain behavior in one jurisdiction while permitting it in another. This is facially unconstitutionally. *See* Va. Const. Art. IV, § 14(1) (forbidding "special" criminal laws)

52.     In refusing to re-open Northern Virginia, EO 62 stated the following:

> On May 9, 2020, local officials from the Counties of
> Arlington, Fairfax, Loudoun and Prince William and the
> Cities of Alexandria, Fairfax, Falls Church, Manassas,
> Manassas Park as well as the Towns of Dumfries, Herndon,
> Leesburg and Vienna … requested to remain in Phase Zero.

53.     Notwithstanding the incorrect nature of that statement,[8] there was no public hearing held by any of these jurisdictions, much less the ones "consulted," prior to determining that the localities should remain "closed."

54.     As a result, Loudoun County remained in "Phase Zero," e.g. no on-site restaurant service (indoors or outdoors), until May 29, 2020. This perforce continued the unplanned closure of the Tigges business.

### Governor And Commissioner Issues Face Covering Order (EO 63) and OPHE Five

55.     On May 26, 2020, seventy-five (75) days after his initial order regard COVID-19, the Governor passed a new order  mandating face masks in all "indoor settings to which the public has access," which included all stores,   In doing so, he stated that "science shows us that face coverings can help stop the spread of the virus."  A copy of EO 63 and OPHE Five is attached hereto as Exhibit G

---

[8]     Undersigned counsel represents the City of Fairfax and Town of Vienna as a State Senator and has spoken with the respective Mayors.  Neither jurisdiction was consulted prior to the release of EO 62.

56.     Yet the Governor failed to explain why this "science" had not been manifest in the ten weeks prior to the issuance of EO 64 when the COVID-19 was allegedly in its most lethal stage and people were walking into essential businesses every day.

57.     Like all relevant orders, the Governor's order failed to include the following:

    i.   Actual scientific data justifying the decision;

    ii.  A date by which the order would terminate;

    iii. Metrics by which the order would be sustained or terminate.

58.     To summarize, the Governor of Virginia on May 26, 2020 – ten weeks into the pandemic – unilaterally decided that all citizens of Virginia should wear a face mask in all public settings for an indefinite time frame, without any attempt to have the decision confirmed by the Assembly or even his own Board of Health.  Indeed, the entire concept stands on its head a long-time Virginia "law," i.e. a measure passed by an elected body, which makes it illegal to wear a mask in public, due to the ability of the masked person to conceal his identity which committing crimes. *See* Va. Code § 18.2-422.

59.     Violation of this new "mask" mandate – never before made in Virginia history (and contrary to existing Code) – is a Class 1 misdemeanor.

<u>Governor Moves Virginia Into Phase Two,
But Not Loudoun County</u>

60.     On June 2, 2020, nine weeks after the issuance of EO 53, Governor Northam issued Executive Order 65 ("EO 65") and Commissioner Oliver issued Order of Public Health Emergency Six ("HO 6"), a 14-page set of orders, which announced that Virginia, with exceptions as stated *infra*, was moving into "Phase Two."  A copy EO 65 and HO6is attached hereto and incorporated herein as Exhibit H.

61.     "Phase Two" as defined in EO 65 and HO 6permitted "indoor dining" for "wineries" with certain vigorous restrictions, such as closing bar seating and requiring employees working with customers to utilize face masks.  It also permitted other "brick and mortar" stores to open as long as limited to "50%" of lowest occupancy load.  Fitness centers and exercise facilities are permitted to open as long as occupancy is no greater than "30%" of lowest occupancy load.  Personal care and personal grooming services are permitted to open with no greater than "50%" of lowest occupancy load.  Outdoor sports and theater venues could also open with "50%" of occupancy load and attendance limited to "50 persons per field."

62.     EO 65 and HO 6 (or "Phase Two") maintained the following prohibitions on any commercial activity whatsoever:

a.  Indoor theaters and performing arts venues;

b.  Bowling alleys, arcades and places of "indoor amusement";

c.  All private and public gatherings of more than fifty (50) persons, including any parties, celebrations, or social events.  *See id.*

63.     To date, EO 65 and HO 6 do not apply to Loudoun County, which remains in "Phase One."Presuming that a later order advances Loudoun County to "Phase Two" then it would still not permit Tigges to open his business, as the restrictions in "Phase Two," e.g. the limitations on seating and number of participants, would still act as a *de facto* closure order for Zion Springs.  In addition, the "mask order" (EO 65) would effectively require all attendees at a wedding to wear a mask – including presumably the bride – thereby defeating the entire premise of a scenic rural wedding.

64.     Violations of all the above orders remain a Class 1 misdemeanor.

65.     None of these Orders have been reviewed or voted upon by the General Assembly of Virginia. The Governor has a unique role in calling a special session; regardless, without a legislative mandate or lawful within the scope of a lawful delegation of administrative agency authority, there can be no binding law.

66.     Most concerning, the preceding Orders, especially EO 61 (Phase 1 re-opening) and OPHE Three and EO63and OPHE Five (face masks) allow an unelected bureaucracy, i.e. the Virginia Department of Health, to pursue ordinary citizens and businesses for previously unknown "crimes," e.g. failing to wear a face mask – or require others to do so –through injunctive relief or a Class 1 misdemeanor (punishable by up to 1 year in prison).  Again, no reference is made to a democratic process – or an expiration date for these powers.

67.     The initial Order (EO 52) which established the public emergency was supposed to expire on June 10, 2020.  It has been since been renewed so that it is expected to last indefinitely or until further order.

68.     Presumably, these Executive Orders could continue until at least January 2022, when the term of the current Governor ends. The Orders of Public Health could exceed that term.

<u>Effect of Executive Orders on Tigges and His Business</u>

69.     The Executive Orders have *de facto* killed the business of Tigges.

70.     Prior to the execution of the first executive order (EO 52) on Tigges, he and his wife had scheduled sixteen (16) wedding packages to occur in the spring and summer of 2020. Those scheduled events have been canceled *in toto* due to the aforementioned pandemic and ensuing executive orders.  This represents over half his total expected revenue for the year.  As a result, he has received virtually zero revenue from March 15, 2020, until the present, while still absorbing all overhead costs related to the business.

71.     Tigges currently has wedding receptions scheduled from July 1, 2020, through the end of the year.  However, he cannot prepare or schedule these events without any knowledge of whether the Governor will deign to re-open his line of business or relax restrictions (like face masking) which are a *de facto* death knell for his line of business.  Clients are already canceling fall weddings based on the uncertainty of when and if the restrictions will end.

72.     Notably, Tigges has immediate means to protect customers from any chance of infection (however slight) from those attending <u>private</u> events:

     a.   Using masked servers;

     b.   Washing and sanitizing all seats and stations after use;

     c.   Restricting attendance to only healthy persons;

     d.   Using age restrictions for attendance.

73.     However, unlike restaurants and venues in other parts of the state, Tigges, located in a rural corner of Loudoun County, has not been allowed to carry on his business amongst those persons who <u>choose</u> to attend an event there.

74.     As a direct result of the Executive Orders, the Tigges have been deprived of the beneficial use of their Property, while Mr. Tigges has had his business taken.

<u>Public Gatherings on June 6, 2020, in Northern Virginia</u>

75.     On the weekend of June 6-7, 2020, in the aftermath of the death of George Floyd, northern Virginia saw at least forty (40) gatherings related to remembering his death and/or protesting the actions leading to it.

76.     Nearly all of those gatherings involved large numbers of people gathered in a limited space.  For example, the "Black Lives Matter" rally in Fairfax City on June 6, 2020 – which undersigned counsel attended –involved at least three hundred (300) people standing for hours in

a downtown park of approximately 1.5 acres.  No police were involved, and the march was encouraged and authorized by local government.

77.     Meanwhile, a larger rally took place in Washington D.C. with approximately 100,000 people attending.

78.     In sum, the decision to close a business like Zion Springs *ad infinitum* while much larger gatherings occur around it is both arbitrary and capricious.

79.     Furthermore, as explained *infra*, there is simply no legal or constitutional basis for running a government by executive order for months on end.

<u>"Public Emergency" Justification Cannot Over-ride Constitution</u>

80.     Under Executive Order 53, the Governor referenced Section 44-146.17 of the Virginia Code which names the Governor as "the Director of Emergency Management."

81.     That section enumerates a list of powers belonging to the Governor in an emergency including the following:

     a.   Regulating the distribution of food, fuel, and clothing;

     b.   Directing or compelling large-scale evacuations;

     c.   Enforcing "an order of quarantine or an order of isolation";

     d.   Procuring supplies and equipment;

     e.   Entering into mutual aid agreements with other states;

     f.   Requesting and receiving Federal assistance.

82.     Nothing in this Section references the closing of an economy or the selection of a class of businesses to be closed or infringement of Constitutional rights such as assembly. Nor

would such a Code Section over-ride constitutional obligations of "due process" or "just compensation" as stated in Article I, Section 11 of the Constitution).

83.    Furthermore, the idea of "public emergency" itself assumes that the Governor must act quickly because the Assembly is either not in session – or cannot be summoned in sufficient time. Va. Code § 44.-146.16. Yet this "emergency" has lasted **three (3) months** at this point, without the Governor requesting any legislative action.

84.    Specifically, an "Emergency" is defined under relevant Virginia code as:

> any occurrence, or threat thereof, whether natural or man-made, which results or may result in substantial injury or harm to the population or substantial damage to or loss of property or natural resources <u>and may involve governmental action beyond that authorized or contemplated by existing law</u> **because governmental inaction for the period required to amend the law to meet the exigency would work immediate and irrevocable harm** upon the citizens or the environment of the Commonwealth or some clearly defined portion or portions thereof (emphasis added)

Va. Code § 44-146.16. This is a clear indication of law that creating law through the delegations to the Governor and Commissioner under these emergency authorities must be limited by a measure of practical time not related to the continued existence of the COVID-19 threat but by the need for the extraordinary action of creating law that subjects citizens and businesses to criminal penalties through emergency authorities.

85.    Under Section 32.1-13, cited by the Governor and Commissioner, there are parallel concerns on the extended and dramatically broad use of the provision as a source of authority to create expansive new law.  Section 32.1-13 is authority the belongs, in the first instance, to the Virginia Board of Health.

86.    The Board of Health finally met on June 4, 2020, after having no meetings in February, March, April, or May. The process and substance behind the Commissioners' orders

were not on the agenda and not discussed in any meaningful way.  Citizens did raise the issues during the short comment period, but the Board has no plans.

87.     In other words, neither the Commissioner nor the Board has had a hearing or public comment period on the substance or process behind the orders.

88.     By contrast, when the Virginia Beach shootings occurred on May 31, 2019, the Governor labeled the General Assembly as "second responders" and called them into session on July 9, 2019 – thirty-nine days after the shootings – to vote on specific gun control legislation. Notably, he did not assume that the killing of innocent people was an "emergency" such that he could unilaterally suspend Second Amendment rights.

89.     The sweep of the orders is enormous relative to purported underlying authority. Not only do the orders entirely lack temporal limitation, they also ban <u>all</u> assemblies for citizens of Virginia. Further, the orders criminalize the above behavior along with criminalizing a private citizen's decision on whether to wear face coverings.

<u>No Finding of "Quarantine" or "Order of Isolation"</u>

90.     In light of the sustained nature of the shutdown, the lack of any legislature ratification, and the sweeping impact on property rights, the only plausible legal explanation is that the Governor's "closing" order, e.g. EO 53 and its progeny, is meant to enforce "a quarantine" or "order of isolation."  *See* Section Va. Code §32.1-48.05.

91.     However, that justification is negated by the following:

    i.   99.9% of Virginians are not sick;

    ii.  As stated *supra* and *infra*, there is no "order of quarantine" or "order of isolation" issued by any relevant agency.

92.     Notably, the "quarantine" statute requires specific findings by the State Health Commissioner about **specific persons**, such as a **factual finding** that those specific persons "have been exposed or infected with … a communicable disease." *See id.*

93.     Furthermore, such a designation would require regulations from the Board of Health that  (a) delineate the "special circumstances" requiring the quarantine of each individual, (b) provide procedures to make sure the quarantine is effected in "**the least restrictive environment**;" and (c) ensure that the "essential needs of the subject of the quarantine order" are met during the quarantine.[9] Va. Code § 32.1-4805 (B).

94.     None of these factors are met.  In fact, the Board of Health has not scheduled any meetings relating to Section 32.1-13, much less made any findings.

95.     Indeed, it has ignored the entire inquiry.

96.     In fact, Executive Order 53 and its progeny made no effort to address any of the factors peculiar to enforcing an order of quarantine or isolation, perhaps because no such order existed – and still does not exist.

<u>Violation of the Virginia Administrative Process Act ("VAPA")</u>

97.     In addition to the emergency powers provided to the Governor by the Code, the HO's also rely on the powers provided in Title 32.1 of the Virginia Code. However, these powers are subject to limitations and oversight—which have been wholly ignored.

---

[9]     The process of determining and enforcing a quarantine is outlined at great length in Section 32.1-4807 which defines quarantine/isolation in terms of an individual patient and requires the State Health Commissioner – **prior to issuing** any order of quarantine – to "ensure that …any quarantine or isolation is implemented in the **least restrictive environment** necessary to contain the communicable disease … any quarantined person must be confined separately from any isolated persons … the health status of any quarantined or isolated persons **shall be monitored regularly** to determine if such persons require continued quarantine or isolation."

98.     Specifically, "all orders and regulations under the provisions of" Title 32.1, shall be governed by "[t]he provisions of the Administrative Process Act (§ 2.2-4000 et seq.)". Va. Code § 32.1-24.

99.     The VAPA is intended to be a default or catch-all source of administrative due process, applicable whenever the basic law fails to provide process.  In summary, the VAPA governs an agency's actions except where that agency's basic law provides its own due process or where the VAPA expressly exempts a particular agency or its actions. *School Bd. v. Nicely*, 12 Va. App. 1051, 1060, 408 S.E.2d 545,550 (1991) (citation omitted). *See* Va. Code §§ 2.2-4002. Accordingly, VAPA applies to both Section 44-167.17 and Section 32.1-13.

100.    VAPA defines a covered agency. "Agency" means any authority, instrumentality, officer, board, or other unit of the state government empowered by the basic laws to make regulations or decide cases. Va. Code § § 2.2-4001. Without the status of operating as an administrative agency, neither the Governor nor Commissioner would have an authority to create law, even to fill in the legislative gaps.

101.    VAPA provides that a "Rule" or "regulation" means any statement of general application, having the force of law, affecting the rights or conduct of any person, adopted by an agency in accordance with the authority conferred on it by applicable basic laws.*Id*. This definition covers the mandates in the orders.

102.    The Governor and Commissioner have violated nearly every relevant provision of the VAPA as it pertains to enacting regulations.

103.    The Governor and Commissioner have not invoked nor followed the conditions of Section 2.2-4111 of the Virginia Code if they were seeking to promulgate emergency regulations

requiring an emergency situation. *See* Va. Code § 2.2-4711 (providing emergency regulation authority).

104.    For example, the Governor and Commissioner have violated §2.2-4007.01 on notice of intended regulatory action.

105.    The Governor and Commissioner have also violated section §2.2-4007.02 on public participation guidelines.

106.    The Governor and Commissioner have violated section §2.2-4007.03 on informational proceedings, which requires notice of all proposed regulations.  As stated in that provision, the failure to comply with the requirements of this section cannot be deemed a mere harmless error.

107.    The Governor and Commissioner have violated section 2.2-4007.04 in failing to provide an economic impact analysis.  Notably, with so much time passed, there is no excuse for not having one to understand the regulations and provide a basis for judicial review.

108.    The Governor have Commissioner have violated section 2.2-4007.04:01 concerning notice of certain departments.

109.    The Governor and Commissioner have violated section 2.2-4007.05 with respect to providing notice to the Registrar.

110.    The Governor and the Commissioner have violated section 2.2-4007 to provide a regulatory flexibility analysis for small businesses.

111.    The Governor and the Commissioner have violated section 2.2-4112 to file the regulation with the Registrar of Regulations.

112.    These provisions are included to facilitate both rational decision-making and judicial review.  All that has been provided is what is stated in a declarative form in the orders.

There is no evidence unless generally cited, no analysis of impacts, no alternatives considered, no record on the parties the Governor and Commissioner have been relying.

113.   The sum of all these errors and omissions has been to render Virginia a Commonwealth ruled by decree, not by democratic methods. The Governor's decrees have destroyed the business of Tigges and many others.

### COUNT ONE
### Constitutional and Civil Rights Pursuant to 42 U.S.C. §§ 1983

114.   Section 1983 of the Civil Rights Acts states that "any person, who under color of any statute, ordinance, regulation, custom or usage of any State … subjects or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges or immunities secured by the Constitution or laws, shall be liable to the party injured in an action at law or suit in equity."

115.   This Section has been interpreted by the Federal courts to protect the rights of citizens who are impacted by actions that deprive both their state and federal rights, including fundamental rights to life, liberty, and property, such as through the unpermitted and uncompensated taking of private property.

116.   As a taxpayer and citizen of the Commonwealth of Virginia, Tigges has a right to utilize his private property and operate his licensed business.  While that right is not unlimited, it cannot be deprived from him without "due process."  *See* U.S. Const. Amend. V.  Nor can the actions taken to divest those rights be taken in an illegal or unconstitutional manner – or (to be more accurate) in a manner in which the Governor is a sole source of power not answerable to the legislature or the Courts.

117.   Tigges has numerous constitutional rights which have been taken from him by the acts described *supra*, including the rights to: organize and participate in assembly; associate with

23

parties regardless of their status in a family or household; have weddings that both include religious and non-religious features; and be free from criminal liability regarding the composition or numbers at assemblies.

118.    Tigges has a right to equal treatment under the law such that the prospective of penalties that may apply to citizens and businesses in one part of a state should not differ and that circumstances that pose the same modicum of risk should not have penalties subjecting certain citizens and businesses to threat of legal sanctions for the same activities.

119.    No action Tigges has taken represents a waiver of this right.

120.    The Governor, through his Executive Order 53 and the additional orders described above, have violated the constitutional rights of Tigges by closing his business without any legal justification and through actions which are (1) in excess of authority, (2) violate procedural law, (3) are not narrowly tailored with respect to infringement of Constitutional rights, (4) violate the Constitutional requirement for equal treatment under the law, (5) should be void for vagueness, and (6) are arbitrary and capricious.  No legal justification has been provided; nor has any alternative plan been outlined.

121.    The Governor's action was taken under color of state law and has been enforced by officials in his administration.  It is plainly unconstitutional.

122.    As a direct and proximate result of the Governor's action, which is ongoing, the Tigges have been injured.  That injury will be vastly multiplied if the Governor is allowed to carry forward these Executive Orders into the fall of 2020 and beyond.  In fact, there is no possible way to operate the business in the future, as long as it is under a threat of such an arbitrary and undemocratic shutdown order.

**PRAYER FOR RELIEF**

24

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

- For appropriate declaratory relief, including an order that the Orders referenced herein are unconstitutional as they (i) exceed the Governor's "emergency" powers as defined by Virginia law, (ii) are not limited in time, scope or manner as required Virginia law, (iii) did not follow any administrative, as required by Virginia law (iv) impermissibly infringe on Constitutional rights through unlawful authority and process, (v) impermissibly infringe on Constitutional rights by not meeting the standards for lawful infringement, (vi) are impermissibly vague and subject to arbitrary enforcement and (vii) are inherently arbitrary and unconstitutional;

- For such other appropriate equitable relief allowed by the Civil Rights Act of 1871, 42 U.S.C. Section 1983, including the enjoining and permanent restraining of these violations as indicated herein;

- For an award of reasonable attorney's fees and costs on his behalf expended pursuant to the Civil Rights Act of 1871, 42 U.S.C. Section 1988; and

- For any other relief deemed just and proper.

PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

JON TIGGES
BY COUNSEL


_____/s/_____
J. Chapman Petersen, Esq. (VSB #37225)
David L. Amos, Esq.  (VSB #87271)
Chap Petersen & Associates
3970 Chain Bridge Road
Fairfax, Virginia 22030
(571) 459-2512 (phone)
(517) 459-2307 (facsimile)
jcp@petersenfirm.com
dla@petersenfirm.com

Nandan Kenkeremath, Esq.*
2707 Fairview Court
Alexandria, Virginia 22311
Phone: (703)407-9407
nandank@comcast.net

*Active member of DC Bar (#384732)
  expected to make appearance *pro hac vice*

## **AFFIDAVIT OF JON TIGGES**

I hereby affirm under penalty of perjury that the allegations of the foregoing Complaint are within my personal knowledge and true.

Jon Tigges

COMMONWEALTH OF VIRGINIA
City of Fairfax, to wit:

Jon B. Tigges appeared before me in person on this day, June 9, 2020 and having first been duly sworn, subscribed his name above.

Cristina Lazo

Notary Public

My commission expires: 09 | 30 | 2022

CRISTINA LAZO
NOTARY
PUBLIC
REG. #7776500
MY COMMISSION
EXPIRES
9/30/2022
COMMONWEALTH OF VIRGINIA