IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JON B. TIGGES,

Plaintiff,

v.

RALPH S. NORTHAM, et al.,

Defendant.

Civil Action No. 3:20-cv-00410-JAG

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Mark R. Herring
*Attorney General*

Erin B. Ashwell (VSB No. 79538)
*Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
*Deputy Attorney General*

Toby J. Heytens (VSB No. 90788)
*Solicitor General*

Michelle S. Kallen (VSB No. 93286)
Martine E. Cicconi (VSB No. 94542)
*Deputy Solicitors General*

Jessica Merry Samuels (VSB No. 89537)
*Assistant Solicitor General*

Zachary R. Glubiak (VSB No. 93984)
*John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

STATEMENT .......... 2

LEGAL STANDARD .......... 7

ARGUMENT .......... 8

I. Plaintiff has failed to establish federal jurisdiction .......... 8

A. Plaintiff improperly asks this Court to instruct Virginia officials on how to conform their conduct to Virginia law .......... 8

B. Most of the challenged orders are no longer operative .......... 13

II. Plaintiff is not entitled to a preliminary injunction under *Winter* .......... 16

A. Plaintiff has not established that he is likely to succeed on the merits .......... 16

B. Plaintiff has not shown he is likely to suffer future irreparable harm in the absence of preliminary relief .......... 24

C. The balance of equities and public interest factors independently foreclose a grant of preliminary equitable relief .......... 25

CONCLUSION .......... 27

CERTIFICATE OF SERVICE .......... 28

**TABLE OF AUTHORITIES**

Page

**Cases**

*ACA Int'l v. Healey*,
No. CV 20-10767-RGS, 2020 WL 2198366 (D. Mass. May 6, 2020) .................................... 11

*Afzall ex rel. Afzall v. Commonwealth*,
273 Va. 226 (2007)................................................................................................................ 13

*Akins v. United States*,
82 Fed. Cl. 619 (2008) ............................................................................................................ 22

*Allen v. Cooper*,
895 F.3d 337 (4th Cir. 2018)................................................................................................. 12

*American Entertainers, L.L.C. v. City of Rocky Mount, N.C.*,
888 F.3d 707 (4th Cir. 2018)................................................................................................. 20

*Atascadero State Hosp. v. Scanlon*,
473 U.S. 234 (1985) ............................................................................................................... 13

*Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*,
550 F.2d 189 (4th Cir. 1977)............................................................................................. 7, 24

*Bowditch v. City of Boston*,
101 U.S. 16 (1879) ................................................................................................................. 22

*Bragg v. W. Virginia Coal Ass'n*,
248 F.3d 275 (4th Cir. 2001)....................................................................................... 9, 12, 13

*Chicago, B. & Q. R. Co. v. Illinois*,
200 U.S. 561 (1906) ............................................................................................................... 22

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ................................................................................................................. 15

*College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
527 U.S. 666 (1999) ............................................................................................................... 13

*Cox v. New Hampshire*,
312 U.S. 569 (1941) ............................................................................................................... 19

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017)............................................................................................ 15, 24

*Elmsford Apartment Assocs. v. Cuomo*,
No. 20-CV-4062 (CM), 2020 WL 3498456 (S.D.N.Y. June 29, 2020).................................. 11

*Ex Parte Young*,
209 U.S. 123 (1908) ....................................................................................................... 9, 11, 12

*Freilich v. Upper Chesapeake Health, Inc.*,
313 F.3d 205 (4th Cir. 2002)................................................................................................. 19

*Hall v. Northam*,
Case No. CL2000632-00 (Culpeper Cty. Cir. Ct. Apr. 30, 2020) ... 18

*Henderson for Nat'l Labor Relations Bd. v. Bluefield Hosp. Co., LLC*,
902 F.3d 432 (4th Cir. 2018) ... 24

*Hunter v. Virginia State Bar*,
786 F. Supp. 2d 1107 (E.D. Va. 2011) ... 13

*Hutto v. S.C. Ret. Sys.*,
773 F.3d 536 (4th Cir. 2014) ... 12

*Idaho v. Coeur d'Alene Tribe of Idaho*,
521 U.S. 261 (1997) ... 9

*In re Microsoft Corp. Antitrust Litig.*,
333 F.3d 517 (4th Cir. 2003) ... 15

*Jacobson v. Massachusetts*,
197 U.S. 11 (1905) ... 17

*Krach v. Holcomb*,
No. 1-20-CV-184-HAB, 2020 WL 2197855 (N.D. Ind. May 6, 2020) ... 14

*Lee-Thomas v. Prince George's Cty. Pub. Sch.*,
666 F.3d 244 (4th Cir. 2012) ... 13

*Lighthouse Fellowship Church v. Northam*,
No. 2:20CV204, 2020 WL 2614626 (E.D. Va. May 21, 2020) ... 11, 26

*Marlowe v. LeBlanc*,
No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) ... 9

*Marshall v. United States*,
414 U. S. 417 (1974) ... 17

*Martinko v. Whitmer*,
-- F. Supp. 3d --, No. 20-CV-10931, 2020 WL 3036342 (E.D. Mich. June 5, 2020) ... 14, 15

*McBurney v. Cuccinelli*,
616 F.3d 393 (4th Cir. 2010) ... 12

*Miller v. Schoene*,
276 U.S. 272 (1928) ... 23

*Ministries v. Newsom*,
-- F. Supp. 3d --, No. 20-cv-683-BAS-AHG, 2020 WL 2991467 (S.D. Cal. June 4, 2020) ... 14

*Mugler v. Kansas*,
123 U.S. 623 (1887) ... 22

*Nken v. Holder*,
556 U.S. 418 (2009) ... 25

*Papasan v. Allain*,
478 U.S. 265 (1986) .......... 9

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) .......... 22

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) .......... passim

*Ralli v. Troop*,
157 U.S. 386 (1895) .......... 23

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
575 F.3d 342 (4th Cir. 2009), .......... 7, 8, 16, 24

*Ross v. Early*,
746 F.3d 546 (4th Cir. 2014) .......... 20

*Rubin v. Coors Brewing Co.*,
514 U.S. 476 (1995) .......... 20

*Rum Creek Coal Sales, Inc. v. Caperton*,
926 F.2d 353 (4th Cir. 1991) .......... 7, 16, 24

*Sampson v. Murray*,
415 U.S. 61 (1974) .......... 24

*SEG Props. v. Northam*,
Case No. CL20-2818 (Loudoun Cty. Cir. Ct. June 10, 2020) .......... 18

*Singleton v. Wulff*,
428 U.S. 106 (1976) .......... 19

*South Bay United Pentecostal Church v Newsom*,
140 S. Ct. 1613 (2020) .......... 8, 17, 23, 26

*Spell v. Edwards*,
-- F.3d --, No. 20-30358, 2020 WL 3287239 (5th Cir. June 18, 2020) .......... 14, 15

*Strother v. Northam*,
Case No. CL20-260 (Fauquier Cty. Cir. Ct. Jun. 29, 2020) .......... 18

*Suarez Corp. Indus. v. McGraw*,
125 F.3d 222 (4th Cir. 1997) .......... 9

*United States v. Caltex*,
344 U.S. 149 (1952) .......... 23

*United States v. Chalk*,
441 F.2d 1277 (4th Cir. 1971) .......... 17

*United States v. W.T. Grant Co.*,
345 U.S. 629 (1953) .......... 15

*Virginia Bd. of Med. v. Virginia Physical Therapy Ass'n*,
13 Va. App. 458 (1991) .......... 13

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .......... 19, 20, 21

*Waste Management Holdings, Inc. v. Gilmore*,
252 F.3d 316 (4th Cir. 2001) .......... 12

*Wilkins v. Gaddy*,
734 F.3d 344 (4th Cir. 2013) .......... 23

*Will v. Michigan Dep't of State Police*,
491 U.S. 58 (1989) .......... 12

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008) .......... passim

*Workman v. Mingo Cty. Bd. of Educ.*,
419 Fed. Appx. 348 (4th Cir. 2011) .......... 20

*Wright v. North Carolina*,
787 F.3d 256 (4th Cir. 2015) .......... 8

*Yee v. City of Escondido*,
503 U.S. 519 (1992) .......... 21

*York v. City of Danville*,
207 Va. 665 (1967) .......... 19

**Constitutional Provisions**

U.S. Const. amend. I .......... 19

U.S. Const. amend. V .......... 21, 22

U.S. Const. amend. XI .......... 8, 9, 12, 13

U.S. Const. amend. XIV .......... 12

Va. Const. art. I, § 1 .......... 9

Va. Const. art. I, § 6 .......... 9, 10

Va. Const. art. I, § 7 .......... 9

Va. Const. art. I, § 11 .......... 9

Va. Const. art. I, § 12 .......... 9, 19

Va. Const. art. IV, § 14(1) .......... 10

Va. Const. art. VII, § 1 .......... 10

Va. Const. art. VIII, § 1 .......... 12

**Statutory Authorities**

42 U.S.C. § 1983 .......... 7, 12, 13

Va. Code, tit. 32.1 .......... 10

Va. Code Ann. § 2.2-4026 .......... 13

Va. Code Ann. § 15.2-1627(B) ........ 12

Va. Code Ann. § 44-75.1 ........ 10

Va. Code Ann. § 44-146.13 *et seq.* ........ 12

Va. Code Ann. § 44-146.17 ........ 10

Va. Code Ann. § 44-146.17(1) ........ 12

**Other Authorities**

Centers for Disease Control and Prevention, Social Distancing – Keep Your Distance to Slow the Spread ........ 20

Derek Chu et al., *Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review and meta-analysis*, Lancet (Jun. 1, 2020) ........ 6

Governor of Virginia, *Safer at Home: Phase Three, Guidelines for Social Gatherings* ........ 6

Johns Hopkins Coronavirus Resource Center, *COVID-19 Dashboard* ........ 2

Justin Mattingly, *WATCH NOW: Democratic senator represents business owners suing Northam over COVID-19 restrictions*, Richmond Times Dispatch (Jun. 9, 2020) ........ 26

Philip Bump, *Fauci puts it bluntly: Coronavirus deaths are undercounted*, Wash. Post (May 12, 2020) ........ 2

Renyi Zhang et al., *Identifying airborne transmission as the dominant route for the spread of COVID-19*, PNAS (Jun. 11, 2020) ........ 6

*Senate District 34 Media Advisory: Petersen to Speak Outside Virginia Supreme Court* (Jun. 9, 2020 8:45 am) ........ 7

Univ. of Va., Biocomplexity Inst., *Estimation of COVID-19 Impact in Virginia* (April 13, 2020) ........ 3

Virginia Dept. of Health, *COVID-19 Cases in Virginia* ........ 2

*Virginia's Statewide Stay at Home Order: Frequently Asked Questions* (*FAQ*) ........ 4

William Wan et al., *Experts and Trump's Advisers Doubt White House's 240,000 Coronavirus Deaths Estimate*, Wash. Post (Apr. 2, 2020) ........ 18

**INTRODUCTION**

At the same time Plaintiff Jon Tigges filed this federal-court action, he filed a petition for writ of mandamus with the state supreme court that "enumerated the same constitutional violations discussed in the present Complaint[.]" PI Mem. at 3. In both cases, Plaintiff Tigges alleges that *Virginia's* Governor and *Virginia's* Health Commissioner exceeded their authority under *Virginia law*.

In plaintiff's parallel state suit, the Supreme Court of Virginia rejected plaintiff's request to "rule [on plaintiff's mandamus petition] without responsive pleadings, or to otherwise expedite the mandamus process." PI Mem. at 3. Plaintiff now asks this Court to "enter a preliminary injunction . . . prohibiting the enforcement" of nearly all of the operative orders issued by Virginia's Governor and Virginia's Health Commissioner to combat COVID-19 and to enjoin "any like orders subsequently issued after this motion." PI Mem. at 9.

That argument should be rejected for multiple independent reasons. Most fundamentally, federal courts may not grant injunctive relief "against state officials on the basis of state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). The fact that the final authority about the meaning of Virginia law did not find plaintiff's arguments about Virginia officials' authority under Virginia law sufficiently persuasive to issue equitable relief outside the normal process of litigation counsels strongly against this Court doing the same thing. Injunctive relief would be particularly inappropriate here, where most of the orders plaintiff asks this Court to rethink are no longer operative, and plaintiff is free to do what he asks this Court to declare: that plaintiff's business can host weddings and corporate events. And all of the *Winter* factors weigh against injunctive relief here: (1) plaintiff has failed to show likelihood of success on the merits; (2) his purely financial alleged harm is not irreparable; (3) and the balance of equities and public interest weigh heavily against a judicial veto of State officials' efforts to protect the

people of the Commonwealth from a once-in-a-century global pandemic that has killed more than half a million people and infected well over 11 million and for which there is no cure or vaccine.

**STATEMENT**

1. In the months since experts first identified the novel coronavirus now known as COVID-19, the disease has infected more than 11 million people worldwide and killed over 500,000—including more than 130,000 in the United States alone.[1] Virginia's confirmed death toll stands at 1,905, with over 67,000 reported cases.[2] And even these numbers, public health officials have explained, are almost certainly undercounts.[3]

2. Lacking a vaccine or cure, officials—in Virginia and elsewhere—have focused on slowing the virus's spread, primarily through a series of emergency executive actions. On March 23, the Governor issued Executive Order 53 (EO 53) (Dkt. 1-2). Emphasizing that "person-to-person contact increases the risk of transmission and community spread," (p. 1), that order prohibited "gatherings of 10 or more," suspended "in-person instruction" in schools, and closed "dining and congregation areas" in restaurants, ¶¶ 1–3.[4] Most "brick and mortar retail

---

[1] Johns Hopkins Coronavirus Resource Center, *COVID-19 Dashboard* (last visited July 8, 2020), https://coronavirus.jhu.edu/map.html.

[2] Virginia Dep't of Health, *COVID-19 Cases in Virginia* (last visited July 8, 2020), https://www.vdh.virginia.gov/coronavirus/.

[3] Philip Bump, *Fauci puts it bluntly: Coronavirus deaths are undercounted*, Wash. Post (May 12, 2020), https://www.washingtonpost.com/politics/2020/05/12/fauci-puts-it-bluntly-coronavirus-deaths-are-undercounted/.

[4] Plaintiff's assertion that this order "[c]losed all restaurants, food courts, breweries, distilleries, wineries, tasting rooms, and farmers' markets," Compl. ¶ 41(b), is inaccurate. The EO simply required "[c]losure of all dining and congregation areas," and specified that these facilities "may continue to offer delivery and take-out services." Dkt. 1-2 ¶ 3. Numerous establishments remained open and offered delivery and take-out services. Plaintiff's business (Zion Springs) itself offered picnics onsite and take-out catering. See Zion Springs Catering, *Now Taking Orders*, (June 28, 2020) (attached as Exhibit 1) ("During this unique time as our

business[es]" were limited to "10 patrons," with certain "[e]ssential" retail businesses not subject to the 10-patron limit. ¶¶ 5, 6. Certain "recreational and entertainment businesses" including fitness centers, personal care and grooming facilities, indoor concert venues, and bowling alleys were required to temporarily "clos[e] [] all public access." ¶ 4. Wineries and scenic event spaces, like Zion Springs, were not required to close.

A week later, the Governor issued Executive Order 55 (EO 55) (attached as Exhibit 2). Implementing the Governor's frequent admonitions to stay at home, the order directed that "[a]ll individuals in Virginia shall remain at their place of residence, except as provided below by this Order and Executive Order 53." ¶ 1. Among other things, EO 55 extended the temporary gatherings restriction to June 10. See EO 55, p.3.

3. Although not without costs, these measures proved effective at reducing COVID-19's spread. Virginians greatly reduced activities after the Governor declared a state of emergency, corresponding with a reduction in the growth rate of COVID-19 cases.[5] The evidence showed that this reduction in activity in Virginia reduced transmission rates by roughly 50%. *Id.* But the progress was fragile. One model predicted that lifting social distancing restrictions too soon could lead to a rapid increase of COVID-19 cases, resulting in a surge of hospitalizations that have the potential to overwhelm Virginia's healthcare system. *Id.* (slide 16). Cognizant of those risks, the Governor announced a multi-phase process for easing restrictions.

a. Phase One began with Executive Order 61 on May 15, 2020. That order explained

---

regularly scheduled wedding celebrations have been postponed, we are pleased to offer some unique picnics for here or to-go."); contra PI Mem. at 2 ("Plaintiff's business has been entirely closed by virtue of the Governor's executive orders and the health emergency orders of Commissioner Oliver.").

[5] Univ. of Va., Biocomplexity Inst., *Estimation of COVID-19 Impact in Virginia* (slide 12) (April 13, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/Combined-PPT-April-13.pdf.

that, because Virginians' "efforts and sacrifices" had "slowed the spread of the virus," it was appropriate to "ease some of the restrictions" imposed in prior orders. Executive Order 61 and Order of Public Health Emergency Three (EO 61) (Dkt. 1-6), p. 2. Accordingly, EO 61 abrogated EO 55's stay-at-home order and substantially loosened restrictions on numerous organizations and activities.[6] Subject to tailored requirements, restaurants were permitted to begin dine-in service on outdoor patios; farmers markets could reopen; fitness centers could host outdoor activities; personal care businesses and indoor shooting ranges could open; "[n]on-[e]ssential [r]etail" businesses could expand occupancy from ten patrons to "50% of the lowest occupancy load"; and campgrounds could open for short-term stays. ¶¶ (A)(2)–(8). Most "recreational and entertainment businesses," however—including "[t]heaters, performing arts centers, [and] concert venues"—were to remain closed. ¶ (B)(1).

b. Concerned that these measures would jeopardize efforts to contain COVID-19, officials in Northern Virginia asked the Governor to delay easing of restrictions in their communities. See Executive Order 62 and Order of Public Health Emergency Four (EO 62) (attached as Exhibit 3). On May 12, the Governor granted that request in a new order jointly issued with the State Health Commissioner. EO 62, pp. 2, 6. Emphasizing that "the Northern Virginia Region face[d] unique challenges when compared to the rest of the Commonwealth"—including a "substantially higher . . . percentage of positive tests," far higher numbers of confirmed cases, and continued difficulties securing sufficient personal protective equipment—EO 62 declared that 13 specified localities (including Loudoun County) would "remain in Phase Zero" for two additional weeks. EO 62, pp. 1–2, 4.

---

[6] *Virginia's Statewide Stay at Home Order: Frequently Asked Questions* (*FAQ*) at 3, https://www.virginia.gov/coronavirus/faq/ (last visited July 8, 2020) ("Is the stay at home order still in effect?") ("If you live in a jurisdiction that has moved into Phase One under Executive Order 61 . . ., the mandatory stay at home order is no longer effective.").

c. On Tuesday, June 2, 2020, noting that the Commonwealth "ha[s] made remarkable progress over the past several weeks," the Governor announced that certain jurisdictions would enter Phase Two on Friday, June 5, and would be governed by Executive Order 65 and Order of Public Health Emergency Six (EO 65) (Dkt. 1-8). Under EO 65, and subject to occupancy, social distancing, and hygiene requirements, restaurants could begin indoor dining service; fitness centers were permitted to open for indoor exercise; public beaches were permitted to open; racetracks could open without spectators; certain recreational and entertainment businesses could open; and private and public social clubs could open. See ¶¶ (A)(2), (5), (9), (10), (11), (12), (13). The temporary gatherings restriction was raised to permit gatherings of up to 50 people. ¶ (B)(2). On June 12, 2020, Northern Virginia joined the rest of the Commonwealth in Phase 2. See Amended Executive Order 65 and Order of Public Health Emergency Six (June 9, 2020) (attached as Exhibit 4).

d. On June 18, Governor Northam announced that the Commonwealth would enter Phase Three on July 1. He explained that, as part of the further easing of restrictions, the temporary gathering ban would be further relaxed to permit gatherings of up to 250 people.[7] As planned, the entire Commonwealth entered Phase Three on July 1. Executive Order 67 and Order of Public Health Emergency Seven (EO 67) (attached as Exhibit 5). In addition to the change to the temporary gatherings restriction, under EO 67 indoor entertainment venues may open and indoor and outdoor recreational sports activities are permitted. EO 67, pp. 2–9 (describing required parameters).[8]

[7] Governor of Virginia Facebook Page, June 18, 2020 briefing at 13:00, https://www.facebook.com/GovernorVA/videos/governor-northam-covid-19-briefing-june-18-2020/266686721059875/?__so__=permalink&__rv__=related_videos.

[8] Best practice advise that "[s]ocial gatherings should be limited to 50% occupancy of the event space, if applicable, or 250 participants, whichever is less." Governor of Virginia, *Safer at*

To minimize COVID-19's spread as businesses expand operations and more people come into contact with each other, the Governor and the Commissioner have also directed people to wear face coverings while inside certain spaces. See Executive Order 63 and Order of Public Health Emergency Five (EO 63) (Dkt. 1-7).[9] This Order applies to patrons over the age of 10 in various commercial settings and certain employees when "working in customer-facing areas." EO 63, p.3.

4. Plaintiff owns a winery where he "grows his own grapes[,] produces his own wines," and "host[s] social gatherings, which include weddings and other private events." Compl. ¶ 9. As part of its events, Zion Springs offers "an outdoor area (and indoor barn) for music and dancing." ¶ 10.[10] Plaintiff filed his complaint on June 9, before Northern Virginia entered Phase One. That same day, plaintiff also filed a petition for mandamus to the Supreme Court of Virginia raising substantially the same allegations.[11] The complaint in this case alleges

---

*Home: Phase Three, Guidelines for Social Gatherings*, https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/Forward-Virginia-Phase-Three-Guidelines.pdf (last visited July 8, 2020). But those who choose not to follow these "best practices" are not subject to penalty for violating these "best practices."

[9] This measure has been shown to significantly slow the virus's spread. See, *e.g.*, Derek Chu et al., *Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review and meta-analysis*, Lancet (Jun. 1, 2020) (meta-analysis of 172 observational studies concluding that wearing face coverings reduces the risk of coronavirus infection); Renyi Zhang et al., *Identifying airborne transmission as the dominant route for the spread of COVID-19*, PNAS (Jun. 11, 2020), https://www.pnas.org/content/early/2020/06/10/2009637117 (concluding that "[t]his protective measure" of mandating face coverings "significantly reduces the number of [COVID-19] infections").

[10] The barn "can accommodate up to 250 seated guests." Zion Springs, *Your unique barn reception*, https://zionsprings.com/all-inclusive-wedding-weekend/ (last visited July 8, 2020).

[11] See Petition for Mandamus, *Park v. Northam et al.* (Va. 2020) (No. 200767) (attached as Exhibit 6); *Senate District 34 Media Advisory: Petersen to Speak Outside Virginia Supreme Court* (Jun. 9, 2020 8:45 am) ("Senator Chap Petersen will be in front of the Virginia Supreme

a single cause of action: violation of 42 U.S.C. § 1983. ¶¶ 114–22. Plaintiff seeks injunctive and declaratory relief. *Id.* p.25. He now seeks a preliminary injunction. Dkts. 6, 7.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). Rather, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation omitted). In all cases, the party seeking injunctive relief (here, plaintiff) "must establish [1] that [he is] likely to succeed on the merits, [2] that [he is] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in their favor, and [4] that an injunction is in the public interest." *Id.* at 20.

Plaintiff makes no mention of the *Winter* factors and instead relies on the balance-of-hardship test from *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir. 1991). *Rum Creek Coal* relied on the pre-*Winter* standard for a preliminary injunction set forth in *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977). But "[b]ecause of its differences with the *Winter* test, the *Blackwelder* balance-of-hardship test may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit, as the standard articulated in *Winter* governs the issuance of preliminary injunctions not only in the Fourth Circuit but in all federal courts." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), cert. granted, judgment vacated on other grounds, 559 U.S. 1089 (2010). That is, the standard in *Rum Creek Coal*—and the standard on which plaintiff bases

---

Court at 1:00 pm . . . for purposes of speaking to the press on issues relating to the COVID-19 Executive Orders and certain civil actions he is filing today in state and Federal court[.]").

his entire motion for a preliminary injunction—"now stands in fatal tension with the Supreme Court's 2008 decision in *Winter*." *Id.* at 346.

## ARGUMENT

Plaintiff's current motion asks this Court to exercise federal jurisdiction to grant emergency equitable relief that would cripple the Governor and Health Commissioner's ability to protect the people of the Commonwealth from a deadly disease that has killed more than half-a-million people and for which "there is no known cure, no effective treatment, and no vaccine." *South Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief). Fortunately, the motion does not merit the sweeping relief it seeks.[12]

### I. Plaintiff has failed to establish federal jurisdiction

Plaintiff's request for injunctive relief fails at the outset because plaintiff has not established federal jurisdiction. Plaintiff's single claim is barred by sovereign immunity and his challenge to expired gatherings restrictions is moot.

#### A. Plaintiff improperly asks this Court to instruct Virginia officials on how to conform their conduct to Virginia law

The Eleventh Amendment "render[s] States immune from being hauled into federal court by private parties." *Wright v. North Carolina*, 787 F.3d 256, 261 (4th Cir. 2015). "This limit on federal judicial power is an essential element of the constitutional design, as immunity accords the States the respect owed them as members of the federation, and protects the States' ability to govern in accordance with the will of their citizens." *Bragg v. W. Virginia Coal Ass'n*, 248 F.3d

[12] Because plaintiff has failed to establish federal jurisdiction and, for the same reasons that plaintiff is unlikely to succeed on the merits (see Section II(A), *infra*), this case should be dismissed. Defendants accordingly are contemporaneously filing a motion to dismiss, which incorporates by reference the arguments made in this memorandum.

275, 291 (4th Cir. 2001) (quotation marks and citations omitted).

1.      As established in a long line of cases flowing from *Ex Parte Young*, 209 U.S. 123 (1908), the injunctive power of a federal court over state officials extends only so far as is necessary to address an ongoing violation of federal law. See *Papasan v. Allain*, 478 U.S. 265, 277 (1986) ("*Young*'s applicability has been tailored to conform as precisely as possible to those specific situations in which it is 'necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984))); accord *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 277 (1997) (same). It is black-letter law that federal courts may not grant injunctive relief "against state officials on the basis of state law." *Pennhurst*, 465 U.S. at 117. "[T]he *Young* doctrine rests on the need to promote the vindication of *federal* rights." *Id.* at 105 (emphasis added). So where "a plaintiff alleges that a state official has violated *state* law, . . . the entire basis for the doctrine of *Young* . . . disappears" and the Eleventh Amendment applies with full force. *Id.* at 106.[13]

The core of plaintiff's complaint is the argument that *Virginia's* Governor and *Virginia's* Health Commissioner exceeded their authority under *Virginia* law. Plaintiff's discussion of constitutional provisions throughout the complaint almost exclusively focuses on the Virginia Constitution.[14] The declaratory relief plaintiff requests includes a declaration that the Governor

---

[13] Accord *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 228 (4th Cir. 1997) ("[A] claim seeking injunctive relief for a state official's violation of state law . . . is barred by the Eleventh Amendment."); *Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425, at *2 (5th Cir. Apr. 27, 2020) ("the essence of *Pennhurst* is that a federal court lacks jurisdiction to sit as a super-state executive by ordering a state entity to comply with its own law").

[14] See Compl. ¶ 1 (alleging that the orders "depriv[e] certain persons of the right under Article I, Section 11 of the Virginia Constitution"); Compl. ¶¶ 13–17 (quoting Article I, Section 1; Article I, Section 6; Article I, Section 7; Article I, Section 11; and Article I, Section 12 of the Virginia Constitution); ¶ 45 (discussing "the rights of Virginians to possess and enjoy private

and the Commissioner's orders "(i) exceed the Governor's 'emergency' powers *as defined by Virginia law*, (ii) are not limited in time, scope or manner *as required [by] Virginia law*, (iii) did not follow any administrative [sic], *as required by Virginia law* . . ." Compl. p.25 (Prayer for Relief) (emphases added).[15] The argument on likelihood of success on the merits in plaintiff's motion for preliminary injunction is also almost entirely based on state law. See PI Mem. at 6 (arguing that the orders did not comply with the Virginia Administrative Process Act); *id.* at 6–7 (discussing the Governor's powers under Virginia law).

To be sure, *Pennhurst* noted a possible exception when a state official is acting *ultra vires*. See 465 U.S. at 101 n.11. But for *Pennhurst* purposes, "a state officer may be said to act *ultra vires* only when he acts *without any authority whatever*." *Id.* (quotation marks and citation omitted) (emphasis added). And plaintiff admits that "[t]he Governor has been delegated certain authorities from the Virginia General Assembly as Director of Emergency Management." Compl. ¶ 6; see also ¶ 33 (noting that the Governor issued the relevant executive orders "under his authority as Governor and Director of Emergency Management under §§ 44-146.17 and 44-75.1 of the Virginia Code"). Plaintiff also recognizes the Virginia Code provisions that confer emergency authority on Virginia's Health Commissioner. See Compl. ¶ 97 (acknowledging that "[i]n addition to the emergency powers provided to the Governor by the Code, the HO's [sic] also rely on the powers provided in Title 32.1 of the Virginia Code"). Plaintiff does not argue

---

property which could only be limited by the 'consent or that of their duly elected representatives.' VA Const. Art. I, § 6."); ¶ 50 (complaining that the orders permitting Northern Virginia to remain in Phase Zero while other parts of the Commonwealth moved to Phase One "was (and is) 'special legislation' which required concurrence from two-thirds of each body of the legislature" under "Va. Const. Art. VII, § 1"); ¶ 51 (arguing enforcement of EO 62 "is facially unconstitutionally [sic]" under "Va. Const. Art. IV, § 14(1)").

[15] None of the remaining forms of declaratory relief identified specify that plaintiff seeks a declaration of an underlying violation of *federal* law. *Id.*

that the Virginia statutes conferring emergency powers on Virginia's Governor and Virginia's Health Commissioner are themselves unconstitutional. Instead, plaintiff argues that the sweep of authority delegated to these state officials by Virginia's legislature is *insufficient* to support the challenged orders. See Compl. ¶ 89 ("[t]he sweep of the orders is enormous relative to purported underlying authority"). Plaintiff's argument that Virginia officials exceeded the authority delegated to them under Virginia law does not overcome the high hurdle set forth in *Pennhurst*. See *ACA Int'l v. Healey*, No. CV 20-10767-RGS, 2020 WL 2198366, at *4 (D. Mass. May 6, 2020) (claim that Attorney General "erred in the exercise of the authority that had been delegated to her, is not sufficient" to fit within the *ultra vires* exception in *Pennhurst*); *Elmsford Apartment Assocs. v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456, at *6 (S.D.N.Y. June 29, 2020) (granting summary judgment to defendants in challenge to governor's executive orders reasoning, "by their own admission, Plaintiffs 'do not argue . . . that [New York's emergency law] is, itself, unconstitutional.' Their claim is not that the Governor lacks the power to respond to the COVID-19 emergency – only that he has abused that power. Therefore, by seeking redress for Governor Cuomo's alleged violations of the authority delegated to him by the New York legislature, Plaintiffs ask the Court 'to police the boundaries of [state law]' " in violation of *Pennhurst*).

2. As another court of this district has already found, any claim against the Governor premised on the *Ex Parte Young* exception to sovereign immunity fails for an independent reason: The Governor has no enforcement duty. See *Lighthouse Fellowship Church v. Northam*, No. 2:20CV204, 2020 WL 2614626, at *5 (E.D. Va. May 21, 2020) (holding Governor Northam was protected by sovereign immunity and was not a proper party in challenge to executive orders

related to COVID-19).[16] The Virginia Services and Disaster Law of 2000, Va. Code Ann. § 44-146.13 *et seq*. (Emergency Law) authorizes the Governor to "issue" executive orders in the event of an emergency, § 44-146.17(1), but nowhere does it authorize him—personally—to enforce them.[17] For this reason too, the Governor is not a proper party.

    3.    None of the other three exceptions to sovereign immunity applies. *First*, "[s]overeign immunity does not . . . prevent the United States itself from bringing suit against an unconsenting State to ensure compliance with federal law," *Bragg v. W. Virginia Coal Ass'n*, 248 F.3d 275, 291 (4th Cir. 2001) (quotation marks and citations omitted), but the United States has not initiated this suit. *Second*, "Congress may abrogate a State's immunity pursuant to its enforcement power under § 5 of the Fourteenth Amendment." *Id.* This exception does not apply because the Supreme Court has squarely held that the statute upon which plaintiff premises his sole cause of action—42 U.S.C. § 1983—does not abrogate States' sovereign immunity and that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." See *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66, 71 (1989).[18]

---

[16] See also *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 332 (4th Cir. 2001) (holding district court erred in not dismissing Virginia Governor because "although Governor Gilmore is under a general duty to enforce the laws of Virginia by virtue of his position as the top official of the state's executive branch, he lacks a specific duty to enforce the challenged statutes"); *Allen v. Cooper*, 895 F.3d 337, 355 (4th Cir. 2018) (*Ex Parte Young* did not provide "an exception to the Eleventh Amendment immunity" in claim against Governor when "it [wa]s apparent that [the Governor did not] have any role in enforcing the statute"); see also *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 550 (4th Cir. 2014) ("a governor cannot be enjoined by virtue of his general duty to enforce the laws").

[17] Prosecutions are committed to the discretion of local Commonwealth's Attorneys, who are separate constitutional officers under Virginia law. See Va. Code Ann. § 15.2-1627(B) (granting Commonwealth's Attorneys "discretion [to] prosecute Class 1 . . . misdemeanors"); accord *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010).

[18] Plaintiff's prayer for relief does not seek damages, but elsewhere, the complaint purports to be "a civil action under 42 U.S.C § 1983 and Article 8, Section I of the Virginia Constitution *seeking damages* and injunctive relief." Compl. ¶ 2 (emphasis added). To the extent plaintiff seeks damages, "plaintiff[] may not recover damages against state officials sued in their

*Third*, a State "may waive its immunity by consenting to be sued in federal court," *Bragg*, 248 F.3d at 2992 (quotation marks and citations omitted), but "[i]n order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal* court," *Pennhurst*, 465 U.S. at 99; see also *Lee-Thomas v. Prince George's Cty. Pub. Sch.*, 666 F.3d 244, 251 (4th Cir. 2012) ("[A] [S]tate does not waive its Eleventh Amendment immunity by consenting to suit in the courts of its own creation, by stating its intention to sue and be sued, or even by authorizing suits in any court of competent jurisdiction." (quotation marks and citation omitted)). Neither the Virginia constitutional provisions nor the Virginia statutory provisions under which plaintiff claims injury waives Virginia's Eleventh Amendment immunity.[19] The Commonwealth's Eleventh Amendment immunity, therefore, remains in full-force.

**B. Most of the challenged orders are no longer operative**

Plaintiff filed his motion for a preliminary injunction on June 24, nearly two weeks after Northern Virginia entered Phase Two (on June 12). EO 65, p. 2. As of June 12, therefore, Zion

---

official capacities for claims asserted under 42 U.S.C. § 1983" because "a state cannot be a defendant." *Hunter v. Virginia State Bar*, 786 F. Supp. 2d 1107, 1111 (E.D. Va. 2011).

[19] "The General Assembly has waived sovereign immunity" in Virginia Administrative Process Act "only to allow a party to obtain judicial review of the Board's adoption of rules or the Board's case decisions." *Afzall ex rel. Afzall v. Commonwealth*, 273 Va. 226, 231 (2007); see generally *Virginia Bd. of Med. v. Virginia Physical Therapy Ass'n*, 13 Va. App. 458, 465 (1991), *aff'd*, 245 Va. 125 (1993) (in Virginia, courts "have consistently held that waiver of immunity cannot be implied from general statutory language or by implication. Statutory language granting consent to suit must be explicitly and expressly announced"). Neither of those circumstances applies here and this provision does not amount to "an unequivocal waiver specifically applicable to *federal-court* jurisdiction," *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985) (emphasis added); see Va. Code Ann. § 2.2-4026; *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) (a State does not "consent to suit in federal court merely by stating its intention to 'sue and be sued,' or even by authorizing suits against it 'in any court of competent jurisdiction'" (citations omitted)); *Lee-Thomas*, 666 F.3d at 251 (same).

Springs was able to host events of up to 50 people. EO 65 ¶ (B)(2). Plaintiff nonetheless claims in his motion for a preliminary injunction that "Zion Springs remains closed to this day under penalty of criminal prosecution." PI Mem. at 2. But if Zion Springs indeed "remains closed," it is not because of the orders plaintiff challenges in this case.

Plaintiff filed his current motion nearly a week after the Governor announced Phase Three, and as of July 1, Zion Springs has been able to host events for up to 250 people. EO 67 ¶ (B)(1). Indeed, six of the eight orders attached to the complaint have expired. See EO 55, p.3 (providing that EO 55 "amends . . . Executive Order 53"); EO 61, p.10 (providing that EO 61 "amends Executive Order 55"); EO 62, p.6 (expired at 11:59 p.m. on May 28); EO 67, p.12 ("Amended Executive Order 65 and Amended Order of Public Health Emergency Six shall expire on Tuesday, June 30, 2020 at 11:59 p.m.").

Numerous courts have held that challenges to expired COVID-19 restrictions are moot. See *Spell v. Edwards*, -- F.3d --, No. 20-30358, 2020 WL 3287239, at *3 (5th Cir. June 18, 2020) ("Governor Edwards's stay-at-home orders expired by their own terms. The plaintiffs' request that we enjoin them is therefore moot."); *Martinko v. Whitmer*, -- F. Supp. 3d --, No. 20-CV-10931, 2020 WL 3036342, at *3 (E.D. Mich. June 5, 2020) (claim challenging superseded COVID-19 restrictions was moot); *Ministries v. Newsom*, -- F. Supp. 3d --, No. 20-cv-683-BAS-AHG, 2020 WL 2991467, at *3 (S.D. Cal. June 4, 2020) ("Because the amended complaint and the preliminary injunction Motion do not challenge the May 25 guidelines, and because the May 25 guidelines superseded the orders challenged in Plaintiff's papers, Plaintiff's Motion is moot."); *Krach v. Holcomb*, No. 1-20-CV-184-HAB, 2020 WL 2197855, at *2 (N.D. Ind. May 6, 2020) ("Challenges to executive orders that have 'expired by their own terms' no longer present a live case or controversy."). Plaintiff's assertion that the Governor "reserved the right to return

Virginia to Phase 1 or Phrase 2," PI Mem. at 4 n.2, is insufficient. "To be sure, no one knows what the future of COVID-19 holds. But it is speculative, at best, that the Governor might reimpose [a former] restriction or a similar one." *Spell*, 2020 WL 3287239, at *3; accord *Martinko*, 2020 WL 3036342, at *3 ("Plaintiffs' assertion that 'there is a good chance that these restrictions will come back,' . . . is pure speculation and does not suffice to avoid the conclusion that their request for prospective injunctive and declaratory relief is moot.").

In any event, to deny preliminary injunctive relief, this Court need not decide whether plaintiff's plea is moot in an Article III sense. "The purpose of an injunction is to prevent future violations," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), and "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse acts," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). For that reason, even where a plaintiff's past harm continues to support Article III standing to seek an injunction, that "equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *Id.* at 111. These principles apply with even greater force where, as here, the requested relief is preliminary. The purpose of a *preliminary* injunction is to "prevent irreparable harm during the pendency of a lawsuit," *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017), and thus "preserve the court's ability to render meaningful judgment on the merits," *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).

As of July 1, the only restrictions at issue in this case that still operate on plaintiff are: (1) EO 67 (which permits gatherings of up to 250 people), and (2) EO 63 (which requires wearing face coverings in certain indoor situations). And the currently effective gathering

restriction poses no barrier to plaintiff's ability to host events given that plaintiff's venue has a maximum capacity of 250 people—exactly the limit under EO 67. See note 10, *supra*. Because plaintiff is currently experiencing no harm whatsoever from restrictions that have already expired on their own accord, plaintiff has no need for an extraordinary exercise of this Court's equitable authority to protect him from these orders.[20]

## II. Plaintiff is not entitled to a preliminary injunction under *Winter*

Even if plaintiff were able to overcome these jurisdictional defects, plaintiff would remain ineligible for the injunctive relief he seeks. Indeed, plaintiff's efforts to show his entitlement to that relief fails to get off the ground because plaintiff's motion for preliminary injunction is premised on a "balance of equities" standard that was rejected more than a decade ago. Under the appropriate preliminary injunction standard, plaintiff has failed to demonstrate his entitlement to the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 24.

### A. Plaintiff has not established that he is likely to succeed on the merits

As an initial matter, plaintiff is simply wrong that "he 'need only show "grave or serious" questions for litigation' for an injunction to be granted." PI Mem. at 5 (quoting *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 363 (4th Cir. 1991)). As the Fourth Circuit has squarely held, the *Rum Creek Coal Sales* standard on which plaintiff relies "stands in fatal tension with the Supreme Court's 2008 decision in *Winter*" and has long since been overruled. *Real Truth*, 575 F.3d at 346. Applying the appropriate standard as set forth in *Winter*, plaintiff has not shown a likelihood of success on the merits.

[20] As explained in Section II(B), *infra*, plaintiff is not experiencing irreparable harm from the indoor face coverings requirement or from the temporary gatherings ban of more than 250 people.

1.      Plaintiff's challenge fails at the outset because it does not acknowledge or engage

with the relevant framework for analyzing emergency measures. "Dealing with . . . an emergency

situation requires an immediacy of action that is not possible for judges," *United States v. Chalk*,

441 F.2d 1277, 1281 (4th Cir. 1971), and "[i]t is no part of the function of a court" to determine

which measures are "likely to be the most effective for the protection of the public against

disease," *Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905). For that reason, in evaluating the

lawfulness of measures taken during an emergency, "the scope of [a court's] review . . . must be

limited to a determination of whether the [executive's] actions were taken in good faith and

whether there is some factual basis for [the Governor's] decision that the restrictions he imposed

were necessary to maintain order." *Chalk*, 441 F.2d at 1281. That framework reflects the

recognition that when "officials 'undertake[] to act in areas fraught with medical and scientific

uncertainties,' their latitude 'must be especially broad,'" and "[w]here those broad limits are not

exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,'

which lacks the background, competence, and expertise to assess public health and is not

accountable to the people." *South Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613,

1613–14 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (quoting

*Marshall v. United States*, 414 U. S. 417, 427 (1974)).

It is hard to imagine a more appropriate circumstance for such deference. As plaintiff

acknowledges, when the orders were issued "public health officials, including the nation's

infectious disease specialist, Anthony Fauci, M.D., were predicting that the United States would

undergo a pandemic that spring that would lead a wholesale loss of life." Compl. ¶ 37.

Authorities estimated that 1.5 to 2.2 million Americans could have died if governments did

nothing to stop the virus,[21] and a battery of evidence supports the conclusion that the actions taken here were necessary to curb its spread. The Governor and the Health Commissioner indisputably acted in good faith in issuing their orders, and their measured and step-by-step approach refutes any suggestion that they acted arbitrarily or without due consideration of the difficult issues involved. Accordingly, their chosen strategy for slowing the spread of COVID-19 and saving lives warrants deference.

2. Plaintiff's arguments that Virginia officials exceeded their authority under Virginia law, see PI Mem. at 6–7, are not properly before this Court. See Section I(A), *supra*.[22] And any claim under the United States Constitution that plaintiff's freedom of assembly, due process, or equal protection clause rights have been violated likewise fails.

***Freedom of assembly***. Plaintiff summarily asserts that the orders to combat COVID-19 in Virginia "suspend[ed] civil rights in Virginia, including the right to peaceably assemble and attend religious services." Compl. ¶ 1. Plaintiff is the wrong party to bring any such claim, which lacks merit in any event.

Plaintiff alleges that "[m]ost weddings" at Zion Springs "also involve a religious service" and that "corporate events and fundraisers can involve discussions of policy and politics as direct parts of the agenda or generally involve political fundraising." Compl. ¶ 11. This assertion, however, cannot establish that *plaintiff's* rights to free exercise or freedom of assembly have

[21] William Wan et al., *Experts and Trump's Advisers Doubt White House's 240,000 Coronavirus Deaths Estimate*, Wash. Post (Apr. 2, 2020), https://tinyurl.com/vymlmsy.

[22] Numerous Virginia courts have rejected the claim that the Governor and State Health Commissioner's orders exceeded their authority under state law. See, *e.g.*, *Hall v. Northam*, Case No. CL2000632-00 (Culpeper Cty. Cir. Ct. Apr. 30, 2020) (attached as Exhibit 7) (Governor did not exceed his authority under State law in ordering certain businesses to close) (pet. for rev denied May 19, 2020); *SEG Props. v. Northam*, Case No. CL20-2818 (Loudoun Cty. Cir. Ct. June 10, 2020) (attached as Exhibit 8) (Governor did not exceed his authority under State law in ordering certain shooting ranges to close); *Strother v. Northam*, Case No. CL20-260 (Fauquier Cty. Cir. Ct. Jun. 29, 2020) (attached as Exhibit 9).

been infringed. To the extent Zion Springs's *clients* may engage in protected activity—such as a religious service or political speech—plaintiff, as co-owner of the venue where such protected activity has the potential to occur, does not have standing to bring a claim on behalf of *his clients'* potentially constitutionally protected speech. *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002) (plaintiff doctor lacked standing to bring ADA claim on behalf of her patients); see generally *Singleton v. Wulff*, 428 U.S. 106, 113 (1976) ("Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation."). Plaintiff's claim that "the instant numerical limitations on assembly do not meet the relevant standard for permissible infringement of Constitutional rights," PI Mem. at 7, is incorrect.

At any rate, plaintiff's claim fails on the merits: restricting gatherings of large groups of people during a pandemic is precisely the sort of reasonable time, place, and manner restriction that has long been permitted under the First Amendment. See *Cox v. New Hampshire*, 312 U.S. 569, 574–78 (1941) (the right to peaceably assemble may be subject to reasonable time, place, and manner restrictions); see also *York v. City of Danville*, 207 Va. 665, 669 (1967) ("While the rights of freedom of speech and assembly [under Article I, § 12 of the Virginia Constitution] are fundamental, they are not absolute and must be exercised in subordination to the general comfort and convenience and in consonance with peace, good order and the rights of others."). "The principal inquiry in determining content neutrality . . . in time, place, or manner cases . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). And here, the 250-person temporary gathering restriction (just like the expired 10-person and 50-person gathering restrictions) is content neutral. See EO 67 ¶ (B)(1) ("*All* public and private in-person

gatherings of more than 250 individuals are prohibited." (emphasis added)). Indeed, the purpose of a temporary restriction on large gatherings has nothing to do with the content of any speech it may incidentally limit.[23]

A temporary restriction on large gatherings during a pandemic easily satisfies the applicable (intermediate) standard of scrutiny. See *American Entertainers, L.L.C. v. City of Rocky Mount, N.C.*, 888 F.3d 707, 716 (4th Cir. 2018). "[T]he Government [] has a significant interest in protecting the health, safety, and welfare of its citizens," *Rubin v. Coors Brewing Co*., 514 U.S. 476, 485 (1995), and a "state's wish to prevent the spread of communicable diseases . . . constitutes a compelling interest," *Workman v. Mingo Cty. Bd. of Educ*., 419 Fed. Appx. 348, 353 (4th Cir. 2011). The restriction on large gatherings materially advances that interest by implementing social-distancing measures designed to mitigate the spread of the novel coronavirus. The restriction is also narrowly tailored because it directly promotes the interest in preserving life and health by implementing targeted social-distancing measures that reflect the recommendations of public health officials across the country.[24] It does not burden "substantially more speech than is necessary," *Ross*, 746 F.3d at 552, because it is limited in duration and

[23] Plaintiff asserts that "in the aftermath of the death of George Floyd, northern Virginia saw at least forty (40) gatherings related to remembering his death and/or protesting the actions leading to it," and "the decision to close a business like Zion Springs *ad infinitum* while much larger gatherings occur around it is both arbitrary and capricious." Compl. ¶¶ 75, 78. Plaintiff provides no support for this assertion. The orders that plaintiff challenges neither exempt nor authorize protest activity. The enforcement of the public-gatherings restriction, moreover, is committed to the discretion of local authorities. See note 17, *supra*.

[24] Centers for Disease Control and Prevention, Social Distancing – Keep Your Distance to Slow the Spread, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited July 8, 2020) ("Limiting close face-to-face contact with others is the best way to reduce the spread of coronavirus disease 2019 (COVID-19)."); see also *Ross v. Early*, 746 F.3d 546, 552–53 (4th Cir. 2014) (an order "is narrowly tailored . . . if it 'promotes a substantial government interest that would be achieved less effectively absent the [order] and does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" (quoting *Ward*, 491 U.S. at 799)).

because it still allows a substantial number of people (250) to gather. The restriction also leaves "open ample alternative channels for communication of [] information," *Ward*, 491 U.S. at 791, including *all* forms of communication that do not involve in-person contact, as well as communication through in-person groups of 250 people or less.

***Takings***. Plaintiff's complaint indicates he may pursue a claim for an unconstitutional taking under the Fifth Amendment. See, *e.g.*, Compl ¶¶ 115–16. As an initial matter, plaintiff's brief supporting his motion for a preliminary injunction abandons any takings argument, and, for that reason alone, he has not shown a likelihood of success on the merits on any such claim for purposes of the current motion. In any event, any takings claim plainly fails.

Plaintiff alleges that, "[a]s a direct result of the Executive Orders, the [members of plaintiff's family] have been deprived of the beneficial use of their Property, while Mr. Tigges has had his business taken." Compl. ¶ 74. The complaint explains that "Tigges currently has wedding receptions scheduled from July 1, 2020, through the end of the year," ¶ 71, but he argues that "the restrictions in 'Phase Two,' e.g. the limitations on seating and number of participants, would still act as a *de facto* closure order for Zion Springs." ¶ 63; ¶ 69 ("The Executive Orders have *de facto* killed the business of Tigges."); ¶ 78 (referring to "the decision to close a business like Zion Springs *ad infinitum*"). Whatever the merits of these allegations, they are no longer relevant—the Commonwealth has since entered Phase Three and Zion Springs may host events for up to 250 people (or its maximum capacity). See EO 67, p.9; note 10, *supra*.

Moreover, no compensation is warranted here. Government regulation requires compensation when, considering the purpose of the regulation and the extent to which it deprives the owner of economic use of the property, "the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee v. City of Escondido*,

503 U.S. 519, 523 (1992). Here, the challenged orders do not single out plaintiff to bear a burden that should be borne by the public as a whole: on the contrary, the Commonwealth has asked the entire public to share the burden of protecting public health.

a. The United States Supreme Court has long "recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). When the government exercises its police powers to prohibit use of property that is "injurious to the health, morals, or safety of the community," such action "cannot in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887).[25] "[T]he character of the governmental action" here weighs decisively against any regulatory taking. *Penn Cent.*, 438 U.S. at 124. The challenged orders are a paradigmatic example of a "public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* And plaintiff has not established that the *temporary* prohibition on *some* activity in connection with his property is a regulatory taking. See *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 334–35 (2002) (32-month moratorium on property development not per se taking).

b. The doctrine of necessity also independently forecloses any takings claim. The Supreme Court has consistently held that that doctrine—which obviates the need for compensation under the Takings Clause—applies when there is an imminent danger and an

[25] See also *Chicago, B. & Q. R. Co. v. Illinois*, 200 U.S. 561, 594 (1906) ("[T]he legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is given." (quotation omitted)); *Akins v. United States*, 82 Fed. Cl. 619, 622 (2008) ("Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause.").

actual emergency giving rise to actual necessity.[26] Even if an otherwise-compensable taking had occurred—which it has not—such "imminent danger" and "actual emergency" are plainly present here. See, *e.g.*, *South Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613–14 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (describing the threat presented by COVID-19); see also *Miller v. Schoene*, 276 U.S. 272, 279 (1928) (when State is "under the necessity of making a choice between the preservation of one class of property and that of the other wherever both existed in dangerous proximity[,] . . . the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another").

***Equal protection***. To the extent plaintiff implies some sort of equal protection violation arising from differential treatment between Northern Virginia and the rest of the Commonwealth, see Compl. ¶ 118, preliminary injunctive relief would be particularly inappropriate because Northern Virginia has entered Phase Three along with the rest of the Commonwealth. Such a claim would also fail on the merits. Because "Northern Virginia" is not a protected class, any differential treatment of Northern Virginia would be subject to (and comfortably satisfy) rational basis review. See *Wilkins v. Gaddy*, 734 F.3d 344, 347–48 (4th Cir. 2013). As EO 62 explained, "with respect to hospitalizations, percent positivity, and case numbers, the Northern Virginia Region face[d] unique challenges when compared to the rest of the Commonwealth," including a

[26] See *Bowditch v. City of Boston*, 101 U.S. 16, 16–19 (1879) (applying doctrine of necessity to absolve the City of Boston of liability for actions of its fire-engineers who demolished a building that was not yet burning, but was located "at a place of danger in the immediate vicinity [of a fire], to arrest the spreading of the fire," a measure that "stopped the progress of the fire"); *Ralli v. Troop*, 157 U.S. 386, 405 (1895) ("rest[ing] on public necessity," public officers "may raze houses to prevent the spreading of a conflagration . . . and no one is bound to compensate for or to contribute to the loss"); *United States v. Caltex*, 344 U.S. 149, 150 (1952) (no compensable taking after United States Military requisitioned and destroyed oil facilities in the Philippines during World War II "[i]n the face of a Japanese advance").

"substantially higher than the rest of the Commonwealth in percentage of positive tests for COVID-19" and the fact that "[o]n any given day, 70% of the Commonwealth's positive cases [were] attributable to the Northern Virginia Region." EO 62, p.1. Given this information, the decision to delay Northern Virginia's reopening is rationally related to the legitimate governmental interest of curbing the spread of a deadly pandemic.

**B. Plaintiff has not shown he is likely to suffer future irreparable harm in the absence of preliminary relief**

Plaintiff admits the only "irreparable harm" he claims is "lost business." PI Mem. at 4. The Supreme Court has been clear that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.*; accord *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017) (same).

Relying again on *Rum Creek Coal*, plaintiff asserts that purely monetary damage to business can be adequate harm to merit a preliminary injection. PI Mem. at 4–5. But (again) *Rum Creek Coal* relies on the wrong standard, one that requires only a showing of "a '*possible*' irreparable injury." *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977) (emphasis added). As the Fourth Circuit has repeatedly explained, "the Supreme Court in *Winter* held that [the] 'possibility of irreparable injury' factor" (which plaintiff advances here) "was 'too lenient' for preliminary equitable relief, thus abrogating the *Blackwelder* test. Instead, *Winter* requires a *likelihood* of irreparable injury, a higher standard." *Henderson for Nat'l Labor Relations Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 438 n.* (4th Cir. 2018); see also *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575

F.3d 342, 346 (4th Cir. 2009), cert. granted, judgment vacated on other grounds, 559 U.S. 1089 (2010) (the preliminary injunction standard used in *Rum Creek Coal* "now stands in fatal tension with the Supreme Court's 2008 decision in *Winter*"). In any event, under Phase Three, plaintiff can do precisely what he asks this Court to declare that he can do: host large weddings and events at Zion Springs.[27] Regardless of any past harm plaintiff has experienced, plaintiff has not established that granting injunctive relief at this point is necessary to prevent additional irreparable harm in the future.[28]

**C. The balance of equities and public interest factors independently foreclose a grant of preliminary equitable relief**

Plaintiff has separately failed to establish that either the balance of the equities or the public interest—which tend to "merge when the Government is the opposing party"—weigh in favor of injunctive relief. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, any harm plaintiff may experience if this Court *denies* a temporary injunction must be balanced against the catastrophic and permanent harm that others could suffer if the Court *grants* one. See *Winter*, 555 U.S. at 24 ("courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" and

[27] To the extent plaintiff argues that he experiences irreparable harm from the requirement that people wear face coverings in certain circumstances, most of the "harm" plaintiff describes arises from confusion about how EO 63 works. Plaintiff speculates that "the 'mask order' . . . would effectively require all attendees at a wedding to wear a mask – including presumably the bride – thereby defeating the entire premise of a scenic rural wedding." Compl. ¶ 63. But the relevant executive order only requires wearing masks *indoors*. See EO 63 ¶ (A) ("All patrons in the Commonwealth aged ten and over shall when entering, exiting, traveling through, and spending time *inside* the settings listed below cover their mouth and nose with a face covering, as described and recommended by the CDC." (emphasis added)). Neither the bride nor attendees of a scenic rural outdoor wedding are required to wear masks. In any event, any injury potentially arising from a bride being required to wear a mask as she walks down the aisle would be experienced by the bride, not plaintiff.

[28] Any speculation that Virginia may revert to a prior restriction is insufficient to establish irreparable harm under *Winter*, which requires plaintiff to "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

"should pay particular regard for the public consequences in employing the extraordinary remedy of injunction" (quotation marks and citation omitted)). Plaintiff asks this Court to invalidate nearly all of Virginia's Governor's and Virginia's Health Commissioner's orders that protect the people of the Commonwealth from COVID-19. The almost inevitable result of granting the requested relief would be increased transmission of a deadly disease for which there is currently no vaccine, no cure, and no established treatment. As another judge in this district recently observed, "[i]t is no exaggeration to recognize that the stakes for residents of the Commonwealth are life-or death." *Lighthouse*, 2020 WL 2110416, at *17.

* * *

In his press conference announcing this case and his parallel Virginia state-court case, counsel for plaintiff stated: "[W]hat we're trying to do is, frankly, bring some rationality back into this discussion, have a public policy discussion, and bring back democracy."[29] But *federal courts* are not the proper venue for discussion about *state public policy*. As Chief Justice Roberts recently emphasized, politically accountable State officials should typically "not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *South Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (quotations marks and citation omitted). Indeed, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs

[29] Justin Mattingly, *WATCH NOW: Democratic senator represents business owners suing Northam over COVID-19 restrictions*, Richmond Times Dispatch (Jun. 9, 2020), https://www.richmond.com/news/virginia/watch-now-democratic-senator-represents-business-owners-suing-northam-over-covid-19-restrictions/article_cecc44c3-6a4e-50ea-9b3c-cc1b05b3aad8.html.

state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

**CONCLUSION**

The motion for a preliminary injunction should be denied.

Respectfully submitted,

By: */s/ Michelle Kallen*

Michelle S. Kallen (VSB No. 93286)
*Deputy Solicitor General*

Toby J. Heytens (VSB No. 90788)
*Solicitor General*

Martine E. Cicconi (VSB No. 94542)
*Deputy Solicitor General*

Jessica Merry Samuels (VSB No. 89537)
*Assistant Solicitor General*

Zachary R. Glubiak (VSB No. 93984)
*John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

Mark R. Herring
*Attorney General*

Erin B. Ashwell (VSB No. 79538)
*Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
*Deputy Attorney General*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2020, a true and accurate copy of this paper was filed electronically with the Court's CM/ECF system, which will then send a notification of such filing to the parties.

By: *_/s/ Michelle S. Kallen_*
Michelle S. Kallen