IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| JON B. TIGGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:20-cv-00410-JAG |
| | ) | |
| RALPH NORTHAM *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
<u>MOTION TO DISMISS</u>**

Mark R. Herring
   *Attorney General*

Erin B. Ashwell (VSB No. 79538)
   *Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
   *Deputy Attorney General*

Toby J. Heytens (VSB No. 90788)
   *Solicitor General*

Michelle S. Kallen (VSB No. 93286)
Martine E. Cicconi (VSB No. 94542)
   *Deputy Solicitors General*

Jessica Merry Samuels (VSB No. 89537)
   *Assistant Solicitor General*

Zachary R. Glubiak (VSB No. 93984)
   *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................ 1

STATEMENT .................................................................................................. 1

LEGAL STANDARD ........................................................................................ 6

ARGUMENT .................................................................................................. 7

I.  Plaintiff has not properly invoked federal jurisdiction to challenge Virginia's executive authority under Virginia law ...................................................8

   A.  The Eleventh Amendment requires that this suit be dismissed in its entirety ...........8

   B.  Any challenge arising from expired restrictions is moot .......................................10

II.  Any federal constitutional claim fails on the merits.........................................11

   A.  Any First Amendment Challenge fails ...............................................................12

   B.  Any takings claim fails ......................................................................................15

   C.  Any equal protection claim fails.........................................................................18

CONCLUSION ............................................................................................... 19

CERTIFICATE OF SERVICE ............................................................................. 20

# TABLE OF AUTHORITIES

Page

## Cases

*ACA Int'l v. Healey*,
No. CV 20-10767-RGS, 2020 WL 2198366 (D. Mass. May 6, 2020) ...................................... 9

*Akins v. United States*,
82 Fed. Cl. 619 (2008) ........................................................................................................... 16

*Allen v. Cooper*,
895 F.3d 337 (4th Cir. 2018)................................................................................................... 10

*American Entertainers, L.L.C. v. City of Rocky Mount, N.C.*,
888 F.3d 707 (4th Cir. 2018) .................................................................................................. 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................................. 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................................. 7

*Best Supplement Guide, LLC v. Newsom*,
No. 220-cv-00965-JAM-CKD, 2020 WL 2615022 (E.D. Cal. May 22, 2020) ......................... 9

*Bowditch v. City of Boston*,
101 U.S. 16 (1879) .................................................................................................................. 17

*Burbach Broad. Co. of Del. v. Elkins Radio Corp.*,
278 F.3d 401 (4th Cir. 2002)..................................................................................................... 7

*United States v. Chalk*,
441 F.2d 1277 (4th Cir. 1971)........................................................................................... 11, 12

*Chicago, B. & Q. R. Co. v. Illinois*,
200 U.S. 561 (1906) ................................................................................................................ 16

*Clark v. Link*,
855 F.2d 156 (4th Cir. 1988).................................................................................................... 18

*Cox v. New Hampshire*,
312 U.S. 569 (1941) ................................................................................................................ 13

*Demetres v. East West Const., Inc.*,
776 F.3d 271 (4th Cir. 2015)..................................................................................................... 7

*Elim Romanian Pentecostal Church v. Pritzker*,
No. 20-1811, 2020 WL 2517093 (7th Cir. May 16, 2020) ........................................................ 9

*Elmsford Apartment Assocs., LLC v. Cuomo*,
No. 20-CV-4062 (CM), 2020 WL 3498456 (S.D.N.Y. June 29, 2020)..................................... 9

*Ex Parte Young*,
209 U.S. 123 (1908) ............................................................................................................ 9, 10

*Freilich v. Upper Chesapeake Health, Inc.*,
  313 F.3d 205 (4th Cir. 2002) .................................................................................... 13

*Graham v. City of Manassas School Bd.*,
  390 F. Supp. 3d 702 (E.D. Va. 2019) ......................................................................... 7

*Hartman v. Acton*,
  No. 2:20-CV-1952, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020) ........................... 9

*Henry v. DeSantis*,
  No. 20-CV-80729, 2020 WL 2479447 (S.D. Fla. May 14, 2020) .............................. 9

*Hunter v. Virginia State Bar*,
  786 F. Supp. 2d 1107 (E.D. Va. 2011) ....................................................................... 8

*Hutto v. S.C. Ret. Sys.*,
  773 F.3d 536 (4th Cir. 2014) .................................................................................... 10

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905) ............................................................................................. 11, 12

*Krach v. Holcomb*,
  No. 1-20-CV-184-HAB, 2020 WL 2197855 (N.D. Ind. May 6, 2020) ..................... 11

*Kuntze v. Josh Enterprises, Inc.*,
  365 F. Supp. 3d 630 (E.D. Va. 2019) .......................................................................... 7

*Lighthouse Fellowship Church v. Northam*,
  No. 2:20CV204, 2020 WL 2614626 (E.D. Va. May 21, 2020) ................................. 9

*Marshall v. United States*,
  414 U. S. 417 (1974) ................................................................................................. 11

*Martinko v. Whitmer*,
  -- F. Supp. 3d --, No. 20-CV-10931, 2020 WL 3036342 (E.D. Mich. June 5,
  2020) ........................................................................................................................ 11

*McBurney v. Cuccinelli*,
  616 F.3d 393 (4th Cir. 2010) .................................................................................... 10

*Miller v. Schoene*,
  276 U.S. 272 (1928) ............................................................................................. 17, 18

*Ministries v. Newsom*,
  -- F. Supp. 3d --, No. 20-cv-683-BAS-AHG, 2020 WL 2991467 (S.D. Cal. June
  4, 2020) ..................................................................................................................... 11

*Mugler v. Kansas*,
  123 U.S. 623 (1887) ................................................................................................. 16

*Penn Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978) ............................................................................................. 16, 17

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) .......................................................................................... 1, 8, 19

*Philips v. Pitt Cty. Mem'l Hosp.*,
 572 F.3d 176 (4th Cir. 2009) ................................................................. 4

*Ralli v. Troop*,
 157 U.S. 386 (1895) ................................................................. 17

*Ross v. Early*,
 746 F.3d 546 (4th Cir. 2014) ................................................................. 15

*Rubin v. Coors Brewing Co.*,
 514 U.S. 476 (1995) ................................................................. 14

*Singleton v. Wulff*,
 428 U.S. 106 (1976) ................................................................. 13

*Snider Int'l Corp. v. Town of Forest Heights, Md.*,
 739 F.3d 140 (4th Cir. 2014) ................................................................. 18

*South Bay United Pentecostal Church v Newsom*,
 140 S. Ct. 1613 (2020) ................................................................. 11, 12, 17, 19

*Spell v. Edwards*,
 -- F.3d --, No. 20-30358, 2020 WL 3287239 (5th Cir. June 18, 2020) ................................ 10, 11

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,
 560 U.S. 702 (2010) ................................................................. 16

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
 535 U.S. 302 (2002) ................................................................. 17

*Texas Democratic Party v. Abbott*,
 961 F.3d 389 (5th Cir. 2020) ................................................................. 9

*United States v. Caltex*,
 344 U.S. 149 (1952) ................................................................. 17

*Ward v. Rock Against Racism*,
 491 U.S. 781 (1989) ................................................................. 14, 15

*Waste Management Holdings, Inc. v. Gilmore*,
 252 F.3d 316 (4th Cir. 2001) ................................................................. 10

*Wilkins v. Gaddy*,
 734 F.3d 344 (4th Cir. 2013) ................................................................. 18

*Workman v. Mingo Cty. Bd. of Educ.*,
 419 Fed. Appx. 348 (4th Cir. 2011) ................................................................. 14

*Yee v. City of Escondido*,
 503 U.S. 519 (1992) ................................................................. 16

*York v. City of Danville*,
 207 Va. 665 (1967) ................................................................. 13

## Constitutional Provisions

U.S. Const. amend. I ................................................................. 12, 13

U.S. Const. amend. v ........................................................................................... 17

U.S. Const. amend. XI ........................................................................... 7, 8, 9, 10

Va. Const. art. I, § 12 ......................................................................................... 13

Va. Const. art. VIII, § 1 ....................................................................................... 8

**Statutory Authorities**

42 U.S.C. § 1983 .................................................................................... 1, 6, 7, 8

Va. Code Ann. § 15.2-1627(B) ........................................................................ 10

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................ 6, 7, 19

Fed. R. Civ. P. 12(b)(6) ................................................................................ 6, 7

Fed. R. Evid. 201(b) ............................................................................................ 4

**Other Authorities**

Centers for Disease Control and Prevention, *Social Distancing – Keep a Safe
   Distance to Slow the Spread* ...................................................................... 15

Derek Chu et al., *Physical distancing, face masks, and eye protection to prevent
   person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic
   review and meta-analysis*, Lancet (Jun. 1, 2020) ......................................... 6

Governor of Virginia, *Safer at Home: Phase Three, Guidelines for Social
   Gatherings* ..................................................................................................... 5

Johns Hopkins Coronavirus Resource Center, *COVID-19 Dashboard* ...................... 1

Philip Bump, *Fauci puts it bluntly: Coronavirus deaths are undercounted*, Wash.
   Post (May 12, 2020) ....................................................................................... 2

Renyi Zhang et al., *Identifying airborne transmission as the dominant route for
   the spread of COVID-19*, PNAS (Jun. 11, 2020) ......................................... 6

Univ. of Va., Biocomplexity Inst., *Estimation of COVID-19 Impact in Virginia
   (April 13, 2020)* ............................................................................................ 3

Virginia Dept. of Health, *COVID-19 Cases in Virginia* ............................................ 1

William Wan et al., *Experts and Trump's Advisers Doubt White House's 240,000
   Coronavirus Deaths Estimate*, Wash. Post (Apr. 2, 2020) ......................... 12

## INTRODUCTION

Plaintiff Jon Tigges asks this Court to declare that Virginia's Governor and Health Commissioner exceeded their authority under Virginia law. But principles of federalism and state sovereign immunity sharply constrain federal courts in scrutinizing state officials' interpretation and application of state law because "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). This caution is particularly apt here, where plaintiff has, simultaneously, raised essentially the same arguments before the state supreme court.

The complaint should be dismissed for other reasons as well. Because numerous restrictions plaintiff challenges have now expired, many of his challenges are now moot. Plaintiff's sole cause of action—42 U.S.C. § 1983—should also be dismissed because plaintiff has failed to allege any violation of a federal right.

The complaint should be dismissed in its entirety.

## STATEMENT

1.     In the months since experts first identified the novel coronavirus now known as COVID-19, the disease has infected more than 11 million people worldwide and killed over 500,000—including more than 130,000 in the United States alone.[1] Virginia's confirmed death toll stands at 1,905, with over 67,000 reported cases.[2] And even these numbers, public health

---

[1] Johns Hopkins Coronavirus Resource Center, *COVID-19 Dashboard* (last visited July 8, 2020), https://coronavirus.jhu.edu/map.html.

[2] Virginia Dep't of Health, *COVID-19 Cases in Virginia* (last visited July 8, 2020), https://www.vdh.virginia.gov/coronavirus/.

officials have explained, are almost certainly undercounts.[3]

2.      Lacking a vaccine or cure, officials—in Virginia and elsewhere—have focused on slowing the virus's spread, primarily through a series of emergency executive actions. On March 23, the Governor issued Executive Order 53 (EO 53) (Dkt. 1-2). Emphasizing that "person-to-person contact increases the risk of transmission and community spread," (p. 1), that order prohibited "gatherings of 10 or more," suspended "in-person instruction" in schools, and closed "dining and congregation areas" in restaurants, ¶¶ 1–3.[4] Most "brick and mortar retail business[es]" were limited to "10 patrons," with certain "[e]ssential" retail businesses not subject to the 10-patron limit. ¶¶ 5, 6. Certain "recreational and entertainment businesses" including fitness centers, personal care and grooming facilities, indoor concert venues, and bowling alleys were required to temporarily "clos[e] [] all public access." ¶ 4. Wineries and scenic event spaces, like plaintiff's business, were not required to close.

3.      Although not without costs, these measures proved effective at reducing COVID-19's spread. Virginians greatly reduced activities after the Governor declared a state of

---

[3] Philip Bump, *Fauci puts it bluntly: Coronavirus deaths are undercounted*, Wash. Post (May 12, 2020), https://www.washingtonpost.com/politics/2020/05/12/fauci-puts-it-bluntly-coronavirus-deaths-are-undercounted/.

[4] Plaintiff's assertion that EO 53 "[c]losed all restaurants, food courts, breweries, distilleries, *wineries*, tasting rooms, and farmers' markets," Compl. ¶ 41, is inaccurate. The EO simply required "[c]losure of all dining and congregation areas," and specified that these facilities "may continue to offer delivery and take-out services." Dkt. 1-2 ¶ 3. Numerous establishments remained open and offered delivery and take-out services. Plaintiff's business (Zion Springs) itself offered picnics onsite and take-out catering. See Exhibit 1 to Opp. to Mot. for Prelim. Injunction (July 8, 2020) ("During this unique time as our regularly scheduled wedding celebrations have been postponed, we are pleased to offer some unique picnics for here or to-go."); contra PI Mem. at 2 ("Plaintiff's business has been entirely closed by virtue of the Governor's executive orders and the health emergency orders of Commissioner Oliver.").

emergency, corresponding with a reduction in the growth rate of COVID-19 cases.[5] The evidence showed that this reduction in activity reduced transmission rates by roughly 50%. *Id.* (slide 23). But the progress was fragile. Evidence reflected that lifting social distancing restrictions too soon could lead to a rapid increase of COVID-19 cases, resulting in a surge of hospitalizations that could overwhelm Virginia's healthcare system. *Id.* (slide 16). Cognizant of those risks, the Governor announced a multi-phase process for easing restrictions.

a.      Phase One began with Executive Order 61 on May 15, 2020. That order explained that, because Virginians' "efforts and sacrifices" had "slowed the spread of the virus," it was appropriate to "ease some of the restrictions" imposed in prior orders. Amended Executive Order 61 and Third Amended Order of Public Health Emergency Three (EO 61) (Dkt. 1-6), p. 2. Accordingly, EO 61 substantially loosened restrictions on numerous organizations and activities. Subject to tailored requirements, restaurants were permitted to begin dine-in service on outdoor patios; farmers markets could reopen; fitness centers could host outdoor activities; personal care businesses and indoor shooting ranges could open; "[n]on-[e]ssential [r]etail" businesses could expand occupancy from ten patrons to "50% of the lowest occupancy load"; and campgrounds could open for short-term stays. ¶¶ (A)(2)–(8). Most "recreational and entertainment businesses," however—including "[t]heaters, performing arts centers, [and] concert venues"—were to remain closed. ¶ (B)(1).

b.      Concerned that these measures would jeopardize efforts to contain COVID-19, officials in Northern Virginia asked the Governor to delay easing of restrictions in their communities. See Amended Executive Order 62 and Amended Order of Public Health

---

[5] Univ. of Va., Biocomplexity Inst., *Estimation of COVID-19 Impact in Virginia* (slide 12) (April 13, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/ governor-of-virginia/pdf/Combined-PPT-April-13.pdf.

Emergency Four (EO 62).[6] On May 12, the Governor granted that request in a new order jointly issued with the State Health Commissioner. EO 62, pp. 2, 6. Emphasizing that "the Northern Virginia Region face[d] unique challenges when compared to the rest of the Commonwealth"—including a "substantially higher . . . percentage of positive tests," far higher numbers of confirmed cases, and continued difficulties securing sufficient personal protective equipment—EO 62 declared that 13 specified localities (including Loudoun County) would "remain in Phase Zero" for two additional weeks. EO 62, pp. 1–2, 5.

      c.      On Tuesday, June 2, 2020, noting that the Commonwealth "ha[s] made remarkable progress over the past several weeks," the Governor announced that certain jurisdictions would enter Phase Two on Friday, June 5, and would be governed by Executive Order 65 and Order of Public Health Emergency Six (EO 65) (Dkt. 1-8). Under EO 65, and subject to occupancy, social distancing, and hygiene requirements, restaurants could begin indoor dining service; fitness centers were permitted to open for indoor exercise; public beaches were permitted to open; racetracks could open without spectators; certain recreational and entertainment businesses could open; and private and public social clubs could open. See ¶¶ (A)(2), (5), (9), (10), (11), (12). The temporary gatherings restriction was raised to permit gatherings of up to 50 people. ¶ (B)(2). On June 12, 2020, Northern Virginia joined the rest of the Commonwealth in Phase 2. See Amended Executive Order 65 and Order of Public Health Emergency Six (June 9, 2020).[7]

---

      [6] EO 62 is available at https://www.governor.virginia.gov/media/governorvirginiagov/ executive-actions/EO-62-and-Order-of-Public-Health-Emergency-Four-AMENDED.pdf. The Court can take judicial notice of executive orders as matters of public record. See *Philips v. Pitt Cty.. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (court may "properly take judicial notice of matters of public record"); Fed. R. Evid. 201(b).

      [7] Amended EO 65 is available at https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-65-and-

d.      On June 18, Governor Northam announced that the Commonwealth would enter

Phase Three on July 1. He explained that, as part of the further easing of restrictions, the

temporary gathering ban would be further relaxed to permit gatherings of up to 250 people.[8] As

planned, the entire Commonwealth entered Phase Three on July 1. Executive Order 67 and Order

of Public Health Emergency Seven (EO 67).[9] In addition to the change to the temporary

gatherings restriction, under EO 67 indoor entertainment venues may open and indoor and

outdoor recreational sports activities are permitted. *Id.* at pp. 7–10 (describing required

parameters).[10]

To minimize COVID-19 spread as businesses expand operations and more people come

into contact with each other, the Governor and the Commissioner have also directed people to

wear face coverings while inside certain spaces. See Executive Order 63 and Order of Public

Health Emergency Five (EO 63) (Dkt. 1-7).[11] The face-coverings order applies to patrons over

---

Order-Of-Public-Health-Emergency-Six---AMENDED---Phase-Two-Easing-of-Certain-Temporary-Restrictions-Due-to-Novel-Coronavirus-(COVID-19).pdf.

[8] Governor of Virginia Facebook Page, June 18, 2020 briefing at 13:00, https://www.facebook.com/GovernorVA/videos/governor-northam-covid-19-briefing-june-18-2020/266686721059875/?__so__=permalink&__rv__=related_videos.

[9] EO 67 is available at https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-67-and-Order-of-Public-Health-Emergency-Seven---Phase-Three-Easing-of-Certain-Temporary-Restrictions-Due-to-Novel-Coronavirus-(COVID-19).pdf.

[10] Best practices advise that "[s]ocial gatherings should be limited to 50% occupancy of the event space, if applicable, or 250 participants, whichever is less." Governor of Virginia, *Safer at Home: Phase Three, Guidelines for Social Gatherings*, https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/Forward-Virginia-Phase-Three-Guidelines.pdf (last visited July 8, 2020). But those who choose not to follow these "best practices" are not subject to penalty for violating these "best practices."

[11] This measure has been shown to significantly slow the virus's spread. See, *e.g.*, Derek Chu et al., *Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review and meta-analysis*, Lancet (Jun. 1, 2020) (meta-analysis of 172 observational studies concluding that wearing face coverings reduces the risk of coronavirus infection); Renyi Zhang et al., *Identifying airborne*

the age of 10 in various commercial settings and certain employees when "working in customer-facing areas." EO 63, p.3.

4.       Plaintiff owns a winery (Zion Springs) where he "grows his own grapes[,] produces his own wines," and "host[s] social gatherings, which include weddings and other private events." Compl. ¶ 9. As part of its events, Zion Springs offers "an outdoor area (and indoor barn) for music and dancing." ¶ 10.

Plaintiff filed this complaint on June 9, before Northern Virginia entered Phase One. That same day, plaintiff also filed a petition for mandamus to the Supreme Court of Virginia raising substantially the same allegations.[12] The complaint in this case alleges a single cause of action: violation of 42 U.S.C. § 1983.  ¶¶ 114–22. Plaintiff seeks injunctive and declaratory relief. *Id.* p. 25. Plaintiff sought a preliminary injunction, Dkts. 6, 7, to which defendants are filing an opposition contemporaneous with this motion to dismiss.

## LEGAL STANDARD

Defendants move this Court to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Defendants' sovereign immunity and mootness arguments are governed by Rule 12(b)(1). See Part I, *infra*. "The burden of establishing subject matter jurisdiction rests with the plaintiff." *Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015). Where a motion under

---

*transmission as the dominant route for the spread of COVID-19*, PNAS (Jun. 11, 2020), https://www.pnas.org/content/early/2020/06/10/2009637117 (concluding that "[t]his protective measure" of mandating face coverings "significantly reduces the number of [COVID-19] infections").

[12] See Memo. in Support of Mot. for Prelim. Injunction, Dkt. 8 (Jun. 24, 2020) (admitting that "[c]ontemporaneous with this Complaint, Tigges filed a Petition for Writ of Mandamus with the Supreme Court of Virginia" that "enumerated the same constitutional violations discussed in the present Complaint").

Rule 12(b)(1) "attack[s] a complaint on its face . . . [for] fail[ing] to allege facts upon which the court can base jurisdiction, . . . the court is required to accept all of the complaint's factual allegations as true," and "afford[] [the plaintiff] the same procedural protection as he would receive under a 12(b)(6) consideration." *Kuntze v. Josh Enterprises, Inc.*, 365 F. Supp. 3d 630, 636 (E.D. Va. 2019) (quotation marks omitted).

Defendants' argument that plaintiff's claims fail as a matter of law is governed by Rule 12(b)(6). See Part II, *infra*. Under that rule, a complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The Court must 'assume the facts alleged in the complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor,' . . . but only to the extent those allegations pertain to facts rather than legal conclusions." *Graham v. City of Manassas School Bd.*, 390 F. Supp. 3d 702, 708–09 (E.D. Va. 2019) (quoting *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002)).

## ARGUMENT

Plaintiff's complaint should be dismissed for two independent reasons. *First*, this Court lacks jurisdiction because the Eleventh Amendment bars equitable relief against any of the defendants and because many of plaintiff's arguments are moot. *Second*, plaintiff's Section 1983 claim fails on the merits.

I. **Plaintiff has not properly invoked federal jurisdiction to challenge Virginia's executive authority under Virginia law**

The complaint suffers from two jurisdictional defects: defendants are protected by sovereign immunity and many of plaintiff's challenges are moot.

A. **The Eleventh Amendment requires that this suit be dismissed in its entirety**

1.     It is black-letter law that federal courts may not grant injunctive relief "against state officials on the basis of state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). The essence of plaintiff's allegations is that defendants—both Virginia officials—exceeded their authority under *Virginia* law. See Compl. ¶¶ 1, 13–17, 45, 50–51 (discussing provisions of the Virginia Constitution). Plaintiff asks this Court for declaratory and injunctive relief, including a declaration that the Governor and the Commissioner's orders "(i) exceed the Governor's 'emergency' powers *as defined by Virginia law*, (ii) are not limited in time, scope or manner *as required [by] Virginia law*, (iii) did not follow any administrative [sic], *as required by Virginia law . . .*" Compl. p.25 (Prayer for Relief) (emphases added).[13] Because this case is about whether *state* officials exceeded their authority under *state* law, sovereign immunity, as set forth in *Pennhurst*, requires dismissal of the complaint.[14]

As federal courts throughout the country have recognized in response to challenges to state officials' orders aimed at combating the COVID-19 pandemic, "constitutional principles of federalism and state sovereign immunity constrain[] [federal courts] from judging a [state]

---

[13] None of the remaining forms of declaratory relief identified specify that plaintiff seeks a declaration of an underlying violation of *federal* law. *Id.*

[14] Plaintiff's prayer for relief does not seek damages, but elsewhere, the complaint purports to be "a civil action under 42 U.S.C § 1983 and Article 8, Section I of the Virginia Constitution *seeking damages* and injunctive relief." Compl. ¶ 2 (emphasis added). To the extent plaintiff seeks damages, "plaintiff[] may not recover damages against state officials sued in their official capacities for claims asserted under 42 U.S.C. § 1983" because "a state cannot be a defendant." *Hunter v. Virginia State Bar*, 786 F. Supp. 2d 1107, 1111 (E.D. Va. 2011).

official's interpretation and application of [state] law." *Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456, at *1 n.3 (S.D.N.Y. June 29, 2020); see, *e.g.*, *Lighthouse Fellowship Church v. Northam*, No. 2:20CV204, 2020 WL 2614626, at *5 (E.D. Va. May 21, 2020) (denying preliminary relief when plaintiffs alleged Governor Northam's COVID-19 executive orders violated Virginia law, reasoning that "[s]uits against state officers for violations of state laws are absolutely barred by Eleventh Amendment immunity."); *Texas Democratic Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020) (*Young* "does not sanction suits targeted at *state*-law violations"); *Elim Romanian Pentecostal Church v. Pritzker*, No. 20-1811, 2020 WL 2517093, at *1 (7th Cir. May 16, 2020) (denying motion for injunction pending appeal because "plaintiffs-appellants may not obtain injunctive relief against the Governor in federal court on the basis of" state law).[15]

2.       Sovereign immunity bars any claim against Governor Northam for a second reason: Governor Northam has no enforcement duty. As another district court recently recognized, Governor Northam has no "special authority to *enforce* the executive orders that he issues in response to an emergency." *Lighthouse Fellowship Church v. Northam*, No. 2:20CV204, 2020 WL 2614626, at *4 (E.D. Va. May 21, 2020) (explaining that "[t]he *Ex parte Young* exception turns on who has the *prospective* authority to *enforce* the law, not on who

---

[15] *ACA Int'l v. Healey*, No. CV 20-10767-RGS, 2020 WL 2198366, at *4 (D. Mass. May 6, 2020) ("it is not for a federal court to police the boundaries of a state constitution for violations by its officials"); *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896, at *3 (S.D. Ohio Apr. 21, 2020) ("Because Plaintiffs raise a claim against a state official, under state law, that would impact the state itself, any non-delegation claim is barred by Eleventh Amendment Sovereign Immunity."); *Elmsford*, 2020 WL 3498456, at *6 ("Federal courts do not have the power to address claims that [the Governor] has violated state law."); *Best Supplement Guide, LLC v. Newsom*, No. 220-cv-00965-JAM-CKD, 2020 WL 2615022, at *7 (E.D. Cal. May 22, 2020) ("Plaintiffs' state constitutional claim against state officials in their official capacity is barred by the Eleventh Amendment."); *Henry v. DeSantis*, No. 20-CV-80729, 2020 WL 2479447, at *6 (S.D. Fla. May 14, 2020) ("claims based on the state constitution are not properly before this Court and must be dismissed").

had *retrospective* authority to *create* the law"); see also Va. Code Ann. § 15.2-1627(B) (granting Commonwealth's Attorneys "discretion [to] prosecute Class 1 . . . misdemeanors"); accord *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010).[16] For this reason too, the Governor is not a proper party.

### B.      Any challenge arising from expired restrictions is moot

Of the eight orders attached to plaintiff's complaint, six have formally expired, including the restriction on gatherings of more than 50 people. See Executive Order 55 (Mar. 30, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf, p.3 (providing that EO 55 "amends . . . Executive Order 53"); EO 61, p.10 (providing that EO 61 "amends Executive Order 55"); EO 62, p.6 (expired at 11:59 pm on May 28); EO 67, p.12 ("Amended Executive Order 65 and Amended Order of Public Health Emergency Six shall expire on Tuesday, June 30, 2020 at 11:59 p.m."). Since July 1, therefore, gatherings of up to 250 people are permitted everywhere in Virginia—including at plaintiff's business. EO 67 ¶ (B)(1).

As numerous federal courts have held, challenges to expired COVID-19 restrictions are moot. See *Spell v. Edwards*, -- F.3d --, No. 20-30358, 2020 WL 3287239, at *3 (5th Cir. June 18, 2020) ("Governor Edwards's stay-at-home orders expired by their own terms. The plaintiffs' request that we enjoin them is therefore moot."); *Martinko v. Whitmer*, -- F. Supp. 3d --, 2020

---

[16] See also *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 332 (4th Cir. 2001) (holding district court erred in not dismissing Virginia Governor because "although Governor Gilmore is under a general duty to enforce the laws of Virginia by virtue of his position as the top official of the state's executive branch, he lacks a specific duty to enforce the challenged statutes"); *Allen v. Cooper*, 895 F.3d 337, 355 (4th Cir. 2018) (*Ex Parte Young* did not provide "an exception to the Eleventh Amendment immunity" in claim against Governor when "it [wa]s apparent that [the Governor did not] have any role in enforcing the statute"); see also *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 550 (4th Cir. 2014) ("a governor cannot be enjoined by virtue of his general duty to enforce the laws").

WL 3036342, at *3 (E.D. Mich. June 5, 2020) (claim challenging superseded COVID-19 restrictions was moot); *Ministries v. Newsom*, -- F. Supp. 3d --, 2020 WL 2991467, at *3 (S.D. Cal. June 4, 2020) ("Because the amended complaint and the preliminary injunction Motion do not challenge the May 25 guidelines, and because the May 25 guidelines superseded the orders challenged in Plaintiff's papers, Plaintiff's Motion is moot."); *Krach v. Holcomb*, 2020 WL 2197855, at *2 (N.D. Ind. May 6, 2020) ("Challenges to executive orders that have 'expired by their own terms' no longer present a live case or controversy."). Although "no one knows what the future of COVID-19 holds[,] . . . it is speculative, at best, that the Governor might reimpose the ten-person restriction or a similar one." *Spell*, 2020 WL 3287239, at *3; accord *Martinko*, 2020 WL 3036342, at *3 ("Plaintiffs' assertion that 'there is a good chance that these restrictions will come back,' . . . is pure speculation and does not suffice to avoid the conclusion that their request for prospective injunctive and declaratory relief is moot.").

## II.     Any federal constitutional claim fails on the merits

As an initial matter, it is important to recognize that the applicable framework here differs from the traditional constitutional analysis.

"Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)). "When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *Id.* (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)); see also *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971) ("Dealing with . . . an emergency situation requires an immediacy of action that is not possible for judges."). "It is no part of the function of a court" to determine which measures are "likely to

be the most effective for the protection of the public against disease." *Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905). For that reason, in evaluating the lawfulness of measures taken during an emergency, "the scope of [a court's] review . . . must be limited to a determination of whether the [executive's] actions were taken in good faith and whether there is some factual basis for [the Governor's] decision that the restrictions he imposed were necessary to maintain order." *Chalk*, 441 F.2d at 1281.

As Chief Justice Roberts emphasized in response to a challenge to another state's COVID-19-related restriction, "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement." *South Bay*, 140 S. Ct. at 1613. It is not disputed, however, that authorities estimated that 1.5 to 2.2 million Americans could have died if governments did nothing to stop the virus,[17] and a battery of evidence supports the conclusion that the actions taken here were necessary to curb its spread. The Governor and the Health Commissioner indisputably acted in good faith in issuing their orders, and their measured and step-by-step approach refutes any suggestion that they acted arbitrarily or without due consideration of the difficult issues involved. Accordingly, their chosen strategy for slowing the spread of COVID-19 and saving lives warrants deference.

Any constitutional challenges fail under the traditional analyses as well.

### A.  Any First Amendment Challenge fails

As an initial matter, plaintiff lacks standing to bring any freedom of assembly or free exercise claim. Plaintiff summarily asserts that the orders to combat COVID-19 in Virginia "suspend[ed] civil rights in Virginia, including the rights to peaceably assemble and attend

---

[17] William Wan et al., *Experts and Trump's Advisers Doubt White House's 240,000 Coronavirus Deaths Estimate*, Wash. Post (Apr. 2, 2020), https://tinyurl.com/vymlmsy.

religious services," Compl. ¶ 1, but nowhere does plaintiff allege he was prevented from attending a peaceful assembly or a religious service. Instead, plaintiff asserts that "[m]ost weddings" at Zion Springs "also involve a religious service" and that "corporate events and fundraisers *can* involve discussions of policy and politics as direct parts of the agenda or generally involve political fundraising." ¶ 11 (emphasis added). But *plaintiff* cannot assert a free exercise or freedom of assembly claim on behalf of *Zion Springs's clients. Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002) (plaintiff doctor lacked standing to bring ADA claim on behalf of her patients); see generally *Singleton v. Wulff*, 428 U.S. 106, 113 (1976) ("Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation."). In any event, any challenge that the 250-person temporary gathering restriction impermissibly infringes on the freedom to assemble also fails on the merits.

First Amendment jurisprudence has long held that the right to peaceably assemble may be subject to reasonable time, place, and manner restrictions. See *Cox v. New Hampshire*, 312 U.S. 569, 574–78 (1941); see also *York v. City of Danville*, 207 Va. 665, 669 (1967) ("While the rights of freedom of speech and assembly [under Article I, § 12] are fundamental, they are not absolute and must be exercised in subordination to the general comfort and convenience and in consonance with peace, good order and the rights of others."). Restricting gatherings of large groups of people during a pandemic is precisely this sort of reasonable time, place, and manner restriction.

***First***, the restriction is content neutral. "The principal inquiry in determining content neutrality . . . in time, place, or manner cases . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock*

*Against Racism*, 491 U.S. 781, 791 (1989). Here, it has not. Even the most stringent form of the temporary gatherings restriction prohibited "[a]ll public and private in-person gatherings of more than 10 individuals," EO 55 ¶ 2, regardless of what happened or was said at those gatherings. Nor does the purpose of a temporary restriction on large gatherings have anything to do with the content of any speech it may incidentally limit.[18]

**Second**, a temporary restriction on large gatherings during a pandemic easily satisfies the applicable standard of scrutiny. When reviewing content-neutral time, place, and manner restrictions, courts "engage[] in a two-part analysis": (1) "determin[ing] whether the regulation materially advances an important or substantial interest"; and, if so, (2) "ask[ing] whether the regulation is narrowly tailored to serve that interest." *American Entertainers, L.L.C. v. City of Rocky Mount, N.C.*, 888 F.3d 707, 716 (4th Cir. 2018) (internal quotation marks, alterations, and citation omitted). Here, the answer to both questions is "yes."

"[T]he Government [] has a significant interest in protecting the health, safety, and welfare of its citizens," *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 485 (1995), and a "state's wish to prevent the spread of communicable diseases . . . constitutes a compelling interest." *Workman v. Mingo Cty. Bd. of Educ.*, 419 Fed. Appx. 348, 353 (4th Cir. 2011). The restriction on large gatherings materially advances that interest by implementing social-distancing measures designed "to mitigate the spread of the novel coronavirus . . . and its effects on Virginians." Amended EO 53, p.1.

---

[18] Plaintiff asserts that "in the aftermath of the death of George Floyd, northern Virginia saw at least forty (40) gatherings related to remembering his death and/or protesting the actions leading to it," and "the decision to close a business like Zion Springs *ad infinitum* while much larger gatherings occur around it is both arbitrary and capricious." Compl. ¶¶ 75, 78. Plaintiff provides no support for this bald assertion. The orders that plaintiff challenges neither exempt nor authorize protest activity. The enforcement of the public-gatherings restriction, moreover, is committed to the discretion of local authorities. See pp. 9–10, *supra*.

The restriction is also narrowly tailored. For these purposes, a restriction "is narrowly tailored . . . if it 'promotes a substantial government interest that would be achieved less effectively absent the'" restriction and does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Ross v. Early*, 746 F.3d 546, 552–53 (4th Cir. 2014) (quoting *Ward*, 491 U.S. at 799). The temporary restriction on large gatherings directly promotes the interest in preserving life and health by implementing targeted social-distancing measures that reflect the recommendations of public health officials across the country.[19] It does not burden "substantially more speech than is necessary," *Ross*, 746 F.3d at 552, because it is limited in duration and because it still allows a substantial number of people (250) to gather. The restriction also leaves "open ample alternative channels for communication of [] information," *Ward*, 491 U.S. at 791, including *all* forms of communication that do not involve in-person contact, as well as communication through in-person groups of 250 people or less.

**B.     Any takings claim fails**

Plaintiff alleges that, "[a]s a direct result of the Executive Orders, the [members of plaintiff's family] have been deprived of the beneficial use of their Property, while [plaintiff himself] has had his business taken." Compl. ¶ 74. To the extent plaintiff attempts to pursue a claim for an unconstitutional taking under the Fifth Amendment, that claim plainly fails.[20]

---

[19] Centers for Disease Control and Prevention, Social Distancing – Keep a Safe Distance to Slow the Spread, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited July 8, 2020) ("Limiting close face-to-face contact with others is the best way to reduce the spread of coronavirus disease 2019 (COVID-19).").

[20] Any potential due process claim is foreclosed by plaintiff's assertion that his business has been taken. See *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not

Government regulation requires compensation when, considering the purpose of the regulation and the extent to which it deprives the owner of economic use of the property, "the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992). The orders do not single out plaintiff to bear a burden that should be borne by the public as a whole: on the contrary, the Commonwealth has asked the entire public to share the burden of protecting public health.

1.      The United States Supreme Court has long "recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). When the government exercises its police powers to prohibit use of property that is "injurious to the health, morals, or safety of the community," such action "cannot in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887).[21] If policies regulating aspects of public life—such as the orders here—were held to be regulatory takings, any general macroeconomic policy could constitute a regulatory taking as applied to those businesses they disadvantaged.

"[T]he character of the governmental action" here weighs decisively against any regulatory taking. *Penn Cent.*, 438 U.S. at 124. The challenged orders are a paradigmatic example of a "public program adjusting the benefits and burdens of economic life to promote the

---

the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (internal quotation marks and citation omitted)).

[21] See also *Chicago, B. & Q. R. Co. v. Illinois*, 200 U.S. 561, 594 (1906) ("[T]he legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is given." (quotation marks omitted)); *Akins v. United States*, 82 Fed. Cl. 619, 622 (2008) ("Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause.").

16

common good." *Id.* And plaintiff has not established that the *temporary* prohibition on *some* activity in connection with their property is a regulatory taking. See *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 334–35 (2002) (32-month moratorium on property development not per se taking).

2.    The doctrine of necessity also independently forecloses any takings claim. The United States Supreme Court has consistently held that that doctrine—which obviates the need for compensation—applies when there is an imminent danger and an actual emergency giving rise to actual necessity.[22] Even assuming that an otherwise-compensable taking had occurred— which it has not—such "imminent danger" and "actual emergency" are plainly present here. See, *e.g.*, *South Bay*, 140 S. Ct. at 1613–14 (describing the threat presented by COVID-19).

In *Miller v. Schoene*, 276 U.S. 272 (1928), for example, the Supreme Court upheld a Virginia statute providing for the uncompensated destruction of cedar trees to prevent the spread of disease. The Court reasoned that the Commonwealth "was under the necessity of making a choice between the preservation of one class of property and that of the other wherever both existed in dangerous proximity." *Id.* at 279. "When forced to such a choice the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another[.]" *Id.* What is true of protecting other property is also true, *a fortiori*, of preserving human life.

---

[22] See *Bowditch v. City of Boston*, 101 U.S. 16, 16–19 (1879) (applying doctrine of necessity to absolve the City of Boston of liability for actions of its fire-engineers who demolished a building that was not yet burning, but was located "at a place of danger in the immediate vicinity [of a fire], to arrest the spreading of the fire," a measure that "stopped the progress of the fire"); *Ralli v. Troop*, 157 U.S. 386, 405 (1895) ("rest[ing] on public necessity," public officers "may raze houses to prevent the spreading of a conflagration . . . and no one is bound to compensate for or to contribute to the loss"); *United States v. Caltex*, 344 U.S. 149, 150 (1952) (no compensable taking after United States Military requisitioned and destroyed oil facilities in the Philippines during World War II "[i]n the face of the Japanese advance").

### C.        Any equal protection claim fails

To the extent plaintiff implies some sort of equal protection violation arising from differential treatment between Northern Virginia and the rest of the Commonwealth, see Compl. ¶ 118, such a claim fails. As an initial matter, Northern Virginia has entered Phase Three along with the rest of the Commonwealth. EO 67 (applying to the entire Commonwealth). Any claim arising from a differential treatment of Northern Virginia in an expired order is, therefore, moot. See Section I(B), *supra*. An equal protection claim also would fail on the merits.

Because "Northern Virginia" is not a protected class, any differential treatment of Northern Virginia would be subject to (and comfortably satisfy) rational basis review. See *Wilkins v. Gaddy*, 734 F.3d 344, 347–48 (4th Cir. 2013). As EO 62 explained, "with respect to hospitalizations, percent positivity, and case numbers, the Northern Virginia Region face[d] unique challenges when compared to the rest of the Commonwealth," including a "substantially higher than the rest of the Commonwealth in percentage of positive tests for COVID-19" and the fact that "[o]n any given day, 70% of the Commonwealth's positive cases [were] attributable to the Northern Virginia Region." EO 62 p.1. Given this information, the decision to delay Northern Virginia's reopening is rationally related to the legitimate governmental interest of curbing the spread of a deadly pandemic.

Because "there is no violation of a federal right, there is no basis for a section 1983 action" here. *Clark v. Link*, 855 F.2d 156, 161 (4th Cir. 1988); see also *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 145 (4th Cir. 2014).

*                *                *

As Chief Justice Roberts recently emphasized, politically accountable State officials should typically "not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to

the people." *South Bay*, 140 S. Ct. at 1614 (quotation marks and citation omitted). Plaintiff asks this Court to do just that. What is more, the complaint asks this Court to instruct Virginia officials on how to conform their conduct to Virginia law. Such an instruction would impermissibly "intru[de] on state sovereignty." *Pennhurst*, 465 U.S. at 106. This is especially problematic here, where plaintiff has a pending case raising these same arguments before the Virginia Supreme Court.

## CONCLUSION

The complaint should be dismissed in its under Federal Rule of Civil Procedure 12(b)(1). In the alternative, the complaint should be dismissed under Rule 12(b)(6).

Respectfully submitted,

**HONORABLE GOVERNOR DR. RALPH S. NORTHAM AND THE HONORABLE COMMISSIONER DR. M. NORMAN OLIVER**

By:   */s/ Michelle S. Kallen*
Michelle S. Kallen (VSB No. 93286)

Mark R. Herring
*Attorney General*

Erin B. Ashwell (VSB No. 79538)
*Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
*Deputy Attorney General*

Toby J. Heytens (VSB No. 90788)
Solicitor General

Martine E. Cicconi (VSB No. 94542)
*Deputy Solicitor General*

Jessica Merry Samuels (VSB No. 89537)
*Assistant Solicitor General*

Zachary R. Glubiak (VSB No. 93984)
*John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7773 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

19

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2020, a true and accurate copy of this paper was filed electronically with the Court's CM/ECF system, which will then send a notification of such filing to the parties.

                     */s/ Michelle S. Kallen*
                     Michelle S. Kallen